# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                                                          **No. 20-cr-1208 JCH**

**BRANDON WARFORD,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

Defendant Brandon Warford, facing a criminal charge for carjacking in violation of 18 U.S.C. § 2119, filed three motions: *Motion to Dismiss Indictment with Prejudice for Violations of Sixth Amendment Speedy Trial Right and the Speedy Trial Act* (ECF No. 23), *Defendant's Opposed Motion to Suppress Identification of Defendant* (ECF No. 24), and *Defendant's Opposed Motion to Suppress Physical Evidence and Statements* (ECF No. 25). The Court reviewed each motion and its response and reply.

First, Mr. Warford alleges that delays to his trial violated his statutory and constitutional rights. But these alleged violations did not prejudice Mr. Warford, so the Court will not dismiss this case. Second, Mr. Warford contends that two witnesses' out-of-court identifications were unconstitutionally suggestive and unreliable. He is correct—admitting testimony about these identifications or permitting in-court identifications by these witnesses would create a substantial likelihood of irreparable misidentification—so the Court will suppress this evidence. Third, Mr. Warford seeks to suppress physical evidence and statements stemming from an alleged warrantless arrest in a home. Because the seizure of Mr. Warford was unreasonable, the Court will exclude this evidence.

I.      **Background**

A.      **Events Preceding Arrest**

At an evidentiary hearing on November 8, 2022, APD Officer Adam Perea alluded to the

following facts. On February 16, 2020, a man approached R.F. and L.P. at knife point. Tr. Hr'g

42, 79 (testimony of Officer Adam Perea); *see also* Def.'s Ex. C, at 10:54 (statement of R.F.)

(describing carjacking as "me and her [L.P.] went down" to where the car was parked). The man

took their vehicle. Tr. Hr'g 42. R.F. called 911. *Id.* at 79. R.F. reported that the man was 5'9" and

wore a baseball cap and a hooded jacket with the hood up. *Id.* at 64-65, 79 (referencing police

report notes of interview during or after initial 911 call). Because Officer Perea did not bolster the

reliability of these facts, and the United States did not offer other evidence to support these facts,

the Court affords these facts minimal weight.

A state arrest warrant affidavit alleges further facts. *See* Arrest Warrant Affidavit 1 (ECF

No. 23-2). R.F. and L.P. initially noticed a man standing by their car. *See id.* The man stated that

he was jogging and just resting. *See id.* R.F. left to remove items from the car. *See id.* R.F. and

L.P. returned and began to enter the car. *See id.* The man approached with two large knives. *See*

*id.* The man ordered R.F. to get out of the area and to step away from the car. *Id.* The man fled

with the car. *Id.* Because the United States neither referenced the affidavit nor bolstered its

allegations in the evidentiary hearing, the Court affords these facts minimal weight.[1]

---

[1] Mr. Warford provided the Court with a copy of the arrest warrant affidavit as an attachment to
his motion to dismiss for violations of the Sixth Amendment and Speedy Trial Act. The copy
contains redactions and is ambiguous—for example, the affidavit is unclear whether just R.F. or
both R.F. and L.P. left the vehicle and returned.

**B.      Arrest**

Four or five days after the carjacking, around eight Albuquerque Police Department ("APD") officers gathered at an apartment complex. *See* Tr. Hr'g 10, 23 (testimony of APD Officer Daniel Lopez) (recalling presence of six to twelve officers).[2] The officers executed an unrelated warrant. *See Id.* at 12. Then, around 5:30 p.m.—with daylight shining—the officers witnessed a black Nissan Altima arrive and park. *See id.* at 11; Def.'s Ex. F, at 0:01. A man exited the car and entered a second-floor apartment. *See* Tr. Hr'g 12.

The officers called the National Crime Information Center ("NCIC") to ask about the Nissan. *See* Tr. Hr'g 22-23, 36; *see also* ECF No. 32, at 2. The VIN showed that the car was reported stolen. *See* Tr. Hr'g 12, 22-23, 36-37. The officers decided to investigate. *See id.* at 13. They did not have a warrant. *See id.* at 14-15.

The second-floor apartment opened onto an outdoor balcony. *See* Def.'s Ex. F, at 1:16. The officers—wearing fully marked tactical police vests and some wearing balaclavas—climbed the stairs to the balcony and approached the apartment from both sides. *See id.* at 0:36-1:21; Tr. Hr'g 9, 34. Five officers stood to the left of the apartment's door and three more stood to the right. *See* Def.'s Ex. F, at 1:26; 5:24. All officers were armed; some carried holstered, assault-style rifles. *Id.*; Tr. Hr'g 34.

Officer Daniel Lopez knocked on the door and said, "police department." Def.'s Ex. F, at 1:21. The apartment had an interior solid door and an exterior, wrought-iron security door. *Id.* at 1:25. The interior door opened. *Id.* But the security door remained locked—a see-through barrier

---

[2] The record reflects uncertainty about whether the arrest took place on February 20 or 21, 2020. *See* Tr. Hr'g 11 (testimony of APD Officer Daniel Lopez) ("From all my written recollection it was on the 20th, however my own body recording device said 21st.").

between the apartment's interior and the balcony. *Id.* The following dialogue comes from Officer

Lopez's lapel camera.[3]

> Officer Lopez: Police Department.
>
> *Door opens.*
>
> Officer Brian Sallee: Door's open.
>
> Occupant: Woah. Yes?
>
> Officer Sallee: Can we talk to whoever's black car that is? Somebody hit it.
>
> Occupant (Unclear if same as above): We don't have a car.
>
> Officer Sallee: *Attempting to turn locked doorknob.* Can we come in and talk to y'all?
>
> Occupant (Unclear if Mr. Warford or same as above): No.
>
> Other Occupant (Different from above; not Mr. Warford): He said no.
>
> *Mr. Warford, in a white shirt, appears behind security door.*
>
> Officer Sallee [to other officers]: Okay he's the one.
>
> Officer Sallee [to Mr. Warford]: Were you in the black car? Why don't you step outside?
>
> Mr. Warford: For what?
>
> Officer Sallee: Because I need to identify you and talk to you about the car.
>
> Mr. Warford: Okay my name is Brandon Warford.
>
> Officer Sallee: *Twisting doorknob.* Okay come outside.
>
> Mr. Warford: What did you just say happened to it?
>
> Officer Sallee: I said somebody scratched it. One of our guys hit it.
>
> Mr. Warford: Okay.
>
> Officer Sallee: So we'd like to talk to you about it.
>
> Mr. Warford: Well we can talk right now.
>
> Officer Lopez [to Officer Sallee]: Is that the one you saw?
>
> Officer Sallee [to Officer Lopez]: Yeah.
>
> Officer Lopez [to Officer Sallee]: So he is the one that you saw?
>
> Officer Sallee [to Officer Lopez]: Yeah.
>
> Officer Lopez: Okay let me get auto theft online.
>
> Officer Lopez [to Mr. Warford]: Okay, brother here is the deal . . . .

---

[3] Although the parties did not present a formal transcript of the audio, the exchange that the Court recounts is a reasonable interpretation of the audio.

Mr. Warford: Auto theft for what?

Officer Lopez: You're going to be under arrest, man. *The key fob around Mr. Warford's neck is visible*. So we're going to be here until you come outside.

Mr. Warford: Go ahead and check my plates. It ain't stolen.

Officer Lopez: It's stolen dude. That's why we're here.

Mr. Warford: Oh yeah I'm sure.

Officer Lopez: I'm not trying to coerce you or anything, dude. We're here because the vehicle is coming back as stolen. That's the only reason why we're here talking to you. We're not going anywhere.

Mr. Warford: So who's the owner then?

Officer Lopez: Who's the owner of the vehicle?

Mr. Warford: Yeah.

Officer Lopez: You're on the phone with the owner of the vehicle now. Do you know who the owner of the vehicle is? 'Cause if you know who the owner is, and you can tell me who the owner is, then I can call them and verify that, then we don't have an issue.

Officer behind Officer Lopez: Let him know that if he doesn't come out, we're going to go get a warrant and go through the whole house.

Officer Lopez: Alright so the last thing we want to do is get a warrant and search your whole apartment, dude. But if you know who the owner is, give me a phone number, I'll call, and I can verify.

Mr. Warford: I got the keys. *Mr. Warford holds up key fob hanging from lanyard around his neck.*

Officer Lopez: Yeah?

Mr. Warford: I'm the owner.

Officer Lopez: No, it's coming back as stolen. That's what I'm telling you.

Mr. Warford: Yeah? You ran the plates and their stolen?

Officer Lopez: No, we ran the VIN. The plate came back to nothing. We ran the VIN number.

Mr. Warford: *Inaudible.* 'Cause literally where I got that car from? I bought it.

Officer Lopez: Boy, if you have all this proof, then . . . .

Mr. Warford: 'Cause I don't trust y'all worth a fuck.

Officer Lopez: Okay, well again, you're under arrest, man.

Officer Sallee: You understand that?

Officer Lopez: We're not leaving.

Mr. Warford: What am I under arrest for?

Officer Sallee (and some other officers): Receiving or transferring a stolen vehicle.

Another occupant: If he steps out, then you don't have to come inside?

Officer Sallee: That's right. We just are looking for him. So if he don't come out, then we gotta come in.

Mr. Warford: I'll go get a jacket.

*Id.* at 1:21-4:12.

Mr. Warford retreated inside, shutting the solid interior door behind him. *Id.* at 4:14. About ten seconds later, another occupant opened the interior door but not the exterior door. *Id.* at 4:20. Officer Sallee asked, "Open the door please." *Id.* at 4:21. The other occupant withdrew, again shutting the interior door. *Id.* at 4:23. Finally, about twenty seconds after going inside, Mr. Warford reappeared with his jacket. *Id.* at 4:35. He opened both doors and stepped outside. *Id.* at 4:50.

The officers immediately handcuffed Mr. Warford on the balcony. *Id.* at 4:56. They walked him downstairs to the parking lot. *Id.* at 5:26. After that, they searched him. *Id.* at 5:38-6:06. The search revealed items and cards in Mr. Warford's pockets. *Id.* at 5:58.

### C.     Investigation and Identification

After the APD arrested Mr. Warford, officers contacted R.F. Criminal Compl. 1 (ECF No. 23-1). R.F. described the carjacking. *Id.* He detailed the assailant as a "Caucasian male subject with blue eyes and tattoos all over his body including his neck." *Id.*

On February 22, 2022, APD Officer Adam Perea met with R.F. to conduct a photo array. Tr. Hr'g 43. The procedure took place in a living room, and these facts come from a video taken by Officer Perea. *See* Def.'s Ex. C, at 1:51.[4]

Before showing any photos, Officer Perea read R.F. instructions from the APD's photographic identification form. These instructions warned that "the person you saw on the date

---

[4] The parties did not present a formal transcript of the audio. The exchange that the Court recounts is a reasonable description of the video from Officer Perea's lapel camera.

of the incident may or may not be in this photographic lineup." The instructions stressed that R.F. should not feel obligated to make an identification. Next, the instructions highlighted that some facial features, such as facial hair, might change. Last, the instructions noted that lighting might affect the tone of the photo. R.F. confirmed his understanding of these instructions. Then, Officer Perea explained that R.F. would initial one of these three options after viewing the photos:

- ___ I positively identify photo number ___ as the offender in this case.
- ___ Photo number ___ resembles the offender in this case but I am *not* positive.
- ___ I do not recognize the offender in this photographic line-up.

*Id.* at 1:51-3:04; *see also* Albuquerque Police Dep't, Photographic Identification Form, Def.'s Ex. B (ECF No. 24-2). With the prerequisites finished, Officer Perea spread five photos across a coffee table. He said, "take your time." R.F. prepared to examine the photos. *Id.* at 3:24-4:02.

But then R.F.'s companion, L.P., entered the room. She joined R.F. on the couch, leaning on his left arm and looking over his shoulder. Officer Perea did not review the prerequisite warnings with L.P. R.F. and L.P. studied the photos. *Id.* at 4:03-4:16.

Then, L.P. said, "I feel like none of those look like him." R.F. replied, "I feel like he looks similar, but . . . ." R.F. pointed toward and leaned over a photo. It is unclear whether R.F. was pointing at and leaning over Photo 3 or Photo 5. Next L.P. pointed to Photo 5, stating, "Yeah probably that one." R.F. said, "I feel like that one too." L.P. then expressed doubt, "But he just looked skinnier." *Id.* at 4:16-4:40.

The couple eliminated other photos. L.P. distinguished Photo 4's tattoos, and R.F. confirmed that Photo 4 was not the assailant. L.P. again pointed at Photo 5. She said, "Yeah, I think it's that one." R.F. replied, "It's very close. I'm not one-hundred percent positive, but there is a thing right here." *Id.* at 4:40-4:55.

R.F. pointed to the second option on the identification form. He read aloud, "Photo number resembles the offender in this case but I am not positive." But then R.F. looked to Officer Perea. R.F. asked, "So if I select that, that's still not positive identification, is it?" It is unclear whether Officer Perea gave a non-verbal response. R.F. then said, "Yeah." Officer Perea answered, "But like I said, there's no obligation. You guys are not obligated to pick anybody. You know. It's one of those things that . . . ." *Id.* at 4:55-5:15.

R.F. raised Photo 5. He asked L.P., "What color do his eyes look to you?" L.P. said, "This picture was taken after he got arrested." R.F. added, "This is probably an old one, isn't it?" Officer Perea replied, "So it's just kind of—I don't know when the photos were taken." L.P. said, "I'm pretty positive, 'cause look at the neck tattoos." R.F. questioned, "Yeah, but the dude was a lot more pale than that, could be the lighting." L.P. hedged, "His eyes were really blue, too." R.F. said, "Yeah, they were." Officer Perea asked, "Were they really blue?" Both L.P. and R.F. confirmed. *See* Def.'s Ex. C, 5:15-5:41. The eyes in Photo 5 do not look blue. *See* Def.'s Ex. A-5 (ECF No. 24-1, at 5).

R.F. then placed the photo on the table. R.F. asked to check a Facebook video of the suspect—he explained that the couple posted about the carjacking on Facebook, and someone on Facebook shared a video of "the actual guy, trying to take somebody else's car." Officer Perea said they should just finish the photo identification. *See* Def.'s Ex. C, at 5:41-6:03.

Officer Perea expressed worry about the couple looking at the photos together. He said, "I usually don't show people together like this, but I wasn't expecting you [L.P.] to come out, so . . . ." L.P. apologized; R.F. explained L.P.'s presence in the house. Officer Perea continued, "They may question it down the road. But no worries. We'll deal with that bridge when we cross it, you know? It's not like I coordinated you coming out." *Id.* at 6:03-6:27.

R.F. made an identification: "I feel like I'm going to go with five. Number five." Officer Perea asked, "Want to go with resembles him? Or? Like what do you feel comfortable with?" R.F. responded, "I don't feel comfortable with pointing out the wrong guy. You know what I mean? But it's not like . . . ." Officer Perea said, "And, you know, like we tell you, you don't have to be certain. This is just part of the investigation." L.P. walked away. R.F. replied, "I see. Okay." Officer Perea added, "You know, we want you to be positive, we want you to be positive, you know." R.F. said, "I understand. Yeah, of course." *Id.* at 6:27-7:11.

Once again, R.F. held up Photo 5, remarking, "He is the right height, though." Photo 5—like Photo 1 but unlike Photos 2, 3, and 4—had height scales in the background. *See* ECF No. 24-1, at 1-5. After looking at Photo 5 some more, R.F. said, "I wish we could see his arms or his hands." Officer Perea said, "Yeah, they make it tough, man." R.F. then put down the photo and concluded, "Yeah, I'm pretty positive it's him." Officer Perea clarified, "You want to say you're pretty positive it's him?" R.F. confirmed, "I get a weird feeling when I look at him. The other guys, I don't care." *See* Def.'s Ex. C, 7:11-7:38.

Officer Perea then instructed R.F. to initial the photos to prove that he looked at them. Next, Officer Perea placed the photographic identification form in front of R.F. He instructed R.F. to "list your selection." As R.F. looked down at the form, Officer Perea touched the two blanks in the first option: "___ I positively identify photo number ___ as the offender in this case." R.F. initialed, affirmed that he provided the information truly and voluntarily, and signed. The video does not show L.P. initialing a form. *Id.* at 7:38-9:18.

### D.    Procedural History

The procedural history seesaws between the state and federal systems. The following facts are not in dispute. As described above, the APD arrested Mr. Warford in February 2020. ECF

No. 23, at 1; Resp. to Mot. to Dismiss 2 (ECF No. 30). In early March, the State of New Mexico ("State") indicted Mr. Warford on two charges: first, for armed robbery, and second, for receiving or transferring a stolen motor vehicle. *See* ECF No. 23, at 2; ECF No. 30, at 5; *see also* Docket Sheet, *State v. Warford*, D-202-cr-2020-00738 (N.M. 2d Jud. Dist. Ct. dismissed Sept. 20, 2020) (armed robbery); Docket Sheet, *State v. Warford*, D-202-cr-2020-0841 (N.M. 2d Jud. Dist. Ct. dismissed Dec. 15, 2021) (receiving or transferring a stolen motor vehicle). Mr. Warford was detained at the Metropolitan Detention Center ("MDC"), a state jail. *See* ECF No. 23, at 2; ECF No. 30, at 5. A state public defender represented Mr. Warford on both state charges. *See* Docket Sheet, *State v. Warford*, D-202-cr-2020-00738; Docket Sheet, *State v. Warford*, D-202-cr-2020-0841; *see also* Fed. R. Evid. 201; *St. Louis Baptist Temple v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

Later that March, the United States filed a sealed criminal complaint that charged Mr. Warford with carjacking. *See* ECF No. 23, at 2; ECF No. 30, at 5. A federal magistrate then issued an arrest warrant (a detainer). *See* ECF No. 30, at 5. The warrant was delivered to MDC, but Mr. Warford continued to serve time in the state facility. *See id.* Then, on May 12, 2020, a federal grand jury indicted Mr. Warford. ECF No. 23, at 2. The indictment was initially sealed. *Id.* at 2.

Returning to the state proceedings, the State filed a nolle prosequi to dismiss the armed-robbery charge on September 20, 2020. Mot. to Dismiss Ex. D, at 1 (ECF No. 23-4) (explaining dismissal "because the Defendant is currently being prosecuted federally and is in federal

custody").[5] The district attorney certified that he provided a copy of the nolle prosequi to Mr. Warford's attorney. *Id.* Fifteen months later, on December 16, 2021, the State also dismissed the receipt-or-transfer charge. ECF No. 30, at 5. Throughout this period, Mr. Warford continued his detention at MDC. *See* ECF No. 23, at 2.

On December 20, 2021, the United States arrested Mr. Warford from MDC and transferred him to federal custody. *Id.* The federal indictment was unsealed that same day. *Id.* Mr. Warford's initial appearance took place on December 21, 2021, and his arraignment and detention hearing took place on December 23, 2021. ECF No. 30, at 6. These proceedings were all on Zoom. *Id.* Since then, Mr. Warford has remained in federal, pretrial custody. *Id.*

On December 28, 2021, the Court set trial for February 14, 2022. *Id.* On January 22, 2022, however, Mr. Warford moved to continue. The Court granted this motion and postponed the trial. Mr. Warford moved to continue three times more, and the Court granted his motion each time. Trial is now scheduled for February 21, 2023. *See* Mot. to Continue (ECF No. 19) (filed Jan. 22, 2022); Order Granting Continuance (ECF No. 20) (filed Jan. 31, 2022) (postponing trial until May 16, 2022); Mot. to Continue (ECF No. 21) (filed Apr. 21, 2022); Order Granting Continuance (ECF No. 22) (filed Apr. 22, 2022) (postponing trial until Aug. 4, 2022); Mot. to Continue (ECF No. 28) (filed July 21, 2022); Order Granting Continuance (ECF No. 29) (filed July 21, 2022) (postponing trial until Nov. 14, 2022); Mot. to Continue (ECF No. 42) (filed Oct. 20, 2022); Order to Continue (ECF No. 43) (filed Oct. 27, 2022) (postponing trial until Feb. 21, 2023).

In addition, on July 11, 2022, Mr. Warford moved to dismiss the federal charge for violations of his constitutional and statutory rights to a speedy trial. He also moved to suppress

---

[5] The statement that Mr. Warford was in federal custody on September 20, 2020, appears to be a mistake.

identifications, physical evidence, and statements on that day. Finally, the Court held an evidentiary hearing on November 8, 2022. APD Officer Daniel Lopez and former APD Officer Adam Perea testified. Tr. Hr'g 8, 39.

All of this occurred against the backdrop of the COVID-19 pandemic. This district court continued or suspended criminal jury trials over three relevant periods:

- Prior to May 12, 2020 (Mr. Warford's federal indictment) through July 31, 2020. *See* Admin. Order, 20-mc-00004-17, at 3 (filed Apr. 27, 2020) (extending prior continuance through May 29, 2020); Admin. Order, 20-mc-00004-19, at 1 (filed May 19, 2020) (extending continuance through July 6, 2020); Admin. Order, 20-mc-00004-27, at 1 (filed July 2, 2020) (extending continuance through July 31, 2020).

- From November 18, 2020, through February 28, 2021. *See* Admin. Order, 20-mc-00004-39, at 1 (filed Nov. 18, 2020) (suspending trials through January 4, 2021); Admin. Order, 20-mc-00004-49, at 2 (filed Dec. 21, 2020) (extending suspension through January 31, 2021); Admin. Order, 21-mc-00004-04, at 2 (filed Jan. 15, 2021) (extending suspension through February 28, 2021).[6]

- From January 14, 2022, through February 13, 2022. *See* Admin. Order, 22-mc-00004-10, at 2 (filed Jan. 14, 2022) (continuing trials).

---

[6] The United States asserts that this district suspended jury trial from March 16, 2020, through February 28, 2021. *See* ECF No. 30, at 11-12. Mr. Warford did not object to this assertion. *See* Def.'s Reply 2-3 (ECF No. 37). But the Court cannot find administrative orders suspending jury trials from August 1 through November 17, 2020. Thus, this Court proceeds with the understanding that administrative orders did not suspend jury trials from August 1, 2020, through November 17, 2020.

Throughout these continuances and suspensions, the federal court permitted matters such as arraignments to be conducted using video or telephone conferencing. *See, e.g.*, Admin. Order, 20-mc-00004-33, at 1-2 (filed Sept. 18, 2020).

## II.    Right to a Speedy Trial

Constitutional and statutory provisions protect a criminal defendant's right to a speedy trial. *See* U.S. Const. amend. VI; 18 U.S.C. §§ 3161-3174.

### A.    Statutory Protections

Mr. Warford does not argue that this case should be dismissed under the Speedy Trial Act ("STA"), 18 U.S.C. § 3161-3174, or the Interstate Agreement on Detainers Act ("IADA"), 18 U.S.C. app. 2. *See* ECF No. 23, at 3-6. But he does argue that both statutes still affect this motion. In sum, Mr. Warford asserts that section 3161(j) of the STA entitled him to prompt notice of his federal indictment. *Id.* at 3. And with that notice, Mr. Warford suggests that he could have used the IADA to demand a trial for his federal charge. *See id.* at 5-6.

As for a remedy, Mr. Warford admits that a violation of the STA's notice provision does not authorize dismissal. *See id.* (citing *United States v. Torres-Centeno*, 211 F.3d 1279, 2000 WL 377475, at *3 (10th Cir. 2000) (unpublished table opinion) (noting proper remedy for violating notice provision is disciplinary sanction against government attorney)); *see also United States v. Cone*, 310 F. App'x 212, 215 (10th Cir. 2008). Mr. Warford still encourages the Court to shoehorn the alleged notice violation into the constitutional speedy trial analysis. As a preview to the constitutional analysis, one consideration is the "degree to which the government caused the delay." *United States v. Batie*, 433 F.3d 1287, 1290 (10th Cir. 2006).

Mr. Warford analogizes to a First Circuit case to show how a statutory violation results in a government bearing responsibility for a delay. *See* ECF No. 23, at 5 (quoting *Rashad v. Walsh*,

300 F.3d 27, 37-38 (1st Cir. 2002)). The First Circuit faulted a state government for a delayed trial when another state had custody over a defendant. *Rashad*, 300 F.3d at 37. The court found that the state's responsibility for the delay was "aggravated" because the state could have sought custody over the defendant under the IADA. *See id.* Presumably (he does not say so explicitly), Mr. Warford asks the Court to ratchet up the United States' responsibility for the delayed trial because the United States did not notify Mr. Warford of the federal indictment. *See* ECF No. 23, at 5.

On the one hand, the Court agrees with Mr. Warford that a government's failure to provide statutorily required notice would seem to increase the government's fault for a delayed trial. Beyond failing to adequately justify a delay, a government's withholding of notice prevents a defendant from taking initiative and demanding trial.[7] On the other hand, overemphasis on a lack of notice would result in a remedy that the STA does not provide. Or said otherwise, if the Court's consideration of a lack of notice tips the constitutional analysis in a defendant's favor, then the Court would dismiss a case for a violation of the STA's notice provision—a result that the statute does not authorize. *See Cone*, 310 F. App'x at 215.

The Court need not resolve whether a violation of the STA's notice provision should increase the government's fault for delay. Nor must the Court decide whether the United States violated section 3161(j). But assume for the sake of argument that the Court can consider a lack of notice in its constitutional analysis and that the United States did violate section 3161(j) by withholding notice. Two obstacles still prevent these assumptions from benefitting Mr. Warford.

First, Mr. Warford has not shown how notice would have helped him. Mr. Warford asserts that "the government's delay prohibited Mr. Warford from asserting his rights under the [IADA]."

---

[7] A defendant's ability to demand trial is not always apparent. In this case, for example, Mr. Warford has not shown how he would have demanded trial with earlier notice. *See* discussion *infra* Section II.B.

*See* ECF No. 23, at 5. But the IADA only applies to *sentenced* prisoners. *See United States v. Wilson*, 719 F.2d 1491, 1494-95 (10th Cir. 1983); *see also United States v. Pardue*, 363 F.3d 695, 698 (8th Cir. 2004); *United States v. Taylor*, 173 F.3d 538, 541 (6th Cir. 1999); 3 Michael B. Mushlin, *Rights of Prisoners* § 11:28, Westlaw (database updated Oct. 2022) ("[S]ince the IADA applies only to sentenced prisoners, it has been held inapplicable to . . . pretrial detainees who have not yet been tried and convicted . . . ."). Mr. Warford was a pretrial detainee in a state facility before his transfer to federal custody. He did not have a right to assert under the IADA.

To the extent Mr. Warford argues that the lack of notice prevented him from invoking other rights under the STA, Mr. Warford does not explain this alleged prejudice. *See* ECF No. 23, at 11. For example, the United States contends that any delay did not breach the STA's seventy-day deadline for a trial's commencement. *See* ECF No. 30, at 6-8. Mr. Warford does not dispute this contention. *See* Def.'s Reply 1 (ECF No. 37).

Second, Mr. Warford *did* have notice of the federal indictment, even if from another source. When the state district attorney filed a nolle prosequi on the armed-robbery charge, the attorney certified that a copy was sent to Mr. Warford's attorney. And the nolle prosequi stated that Mr. Warford was "currently being prosecuted federally." ECF No. 23-4, at 1. As a result, any notice from the STA about the federal indictment would have been surplusage after the nolle prosequi in September 2020.

Even under the assumptions that the Court can consider violations of the STA's notice provision in the Court's constitutional analysis and that a notice violation occurred, Mr. Warford has not shown why a lack of notice hurt his case. All in all, Mr. Warford cannot use the STA or the IADA to dismiss this case. The Court thus proceeds to the constitutional analysis.

**B.      Constitutional Protections**

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. The remedy for a Sixth Amendment speedy trial violation is dismissal of the case with prejudice. *United States v. Toombs*, 574 F.3d 1262, 1274 (10th Cir. 2009). To determine whether a defendant suffered a deprivation of his Sixth Amendment right to a speedy trial, a court should balance these four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530-31 (1972)).

**1.      Length of Delay**

The speedy trial right attaches when a defendant "is arrested or indicted on federal charges, whichever come[s] first." *United States v. Banks*, 761 F.3d 1163, 1181 (10th Cir. 2014). The length of the delay is then measured from that point—"the earlier of either arrest or indictment." *Batie*, 433 F.3d at 1290. The delay period ends with trial or denial of the motion to dismiss. *United States v. Nixon*, 919 F.3d 1265, 1269 (10th Cir. 2019).

This factor is the threshold consideration for the entire *Barker* analysis. *Id.* A court needs to consider the remaining factors only if the delay is "presumptively prejudicial." *United States v. Hill*, 197 F.3d 436, 443-44 (10th Cir. 1999) (citation omitted). Delays of over one year generally satisfy the requirement of presumptive prejudice. *United States v. Seltzer*, 595 F.3d 1170, 1176 (10th Cir. 2010) (citing *Batie*, 433 F.3d at 1290).

If the defendant shows presumptive prejudice, the court must then consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Seltzer*, 595 F.3d at 1176. In determining whether the length of the delay favors the

16

defendant, a court may also consider the nature and complexity of the charges. *See id.*; *Banks*, 761 F.3d at 1182 (noting simpler charges favor defendant).

In this case, the United States indicted Mr. Warford on May 12, 2020. Mr. Warford's speedy trial right thus attached on this date. *See Seltzer*, 595 F.3d at 1176. After Mr. Warford's federal arrest and appearance in late December 2021, the Court scheduled his first trial date on February 14, 2022. On January 22, 2022, Mr. Warford first moved to continue the trial, and during the sequence of continuances, filed the current motion. The roughly thirty-one-month delay between the indictment in mid-May 2020 and the filing of this memorandum opinion in mid-December 2022 is presumptively prejudicial.[8]

As for complexity, this carjacking case is simple. The United States' factual recitation suggests that it will rely on eyewitness testimony and surveillance video. *See* ECF No. 30, at 1-4. The length-of-delay factor thus favors Mr. Warford. *See Seltzer*, 595 F.3d at 1176 (explaining that first factor favors defendant where delay was two years; felon-in-possession, drug, and counterfeit charges were straightforward; and government secured eyewitness testimony).

---

[8] Mr. Warford first named a nineteen-month delay—from the May 2020 federal indictment to the December 2021 federal arraignment. *See* ECF No. 23, at 7. The United States, by contrast, described the delay as continuing through the date of the filing of its opposition to this motion. *See* ECF No. 30, at 9 (counting twenty-six months through July 2022 filing). Presumably (the United States did not say so explicitly), the United States did not stop the clock because the delay period continues through trial or the denial of the motion to dismiss. *See Nixon*, 919 F.3d at 1269 (terminating delay period with ruling on motion to dismiss). Mr. Warford then adopted the United States' description of a twenty-six-month delay in his reply. *See* ECF No. 37, at 2.

The different descriptions of the delay will not affect this case. The shorter description of the delay—that is, nineteen months ending in federal arraignment—surpasses the one-year presumption of prejudice. *See Seltzer*, 595 F.3d at 1176. And the extension of the delay—that is, twenty-six (and now thirty-one) months ending in the denial of this motion—is fully attributable to Mr. Warford. *See Batie*, 433 F.3d at 1291 (noting government not at fault for delays resulting from defendant's continuances or motions). In sum, the shorter description will not weaken Mr. Warford's motion, just as the longer description will not strengthen Mr. Warford's motion.

### 2.      Reason for the Delay

The Court must assess the "degree to which the government caused the delay." *Batie*, 433 F.3d at 1291. The burden is on the government to provide an acceptable reason for the delay. *Banks*, 761 F.3d at 1183. Purposeful or bad-faith delays weigh heavily against the government. *United States v. Frias*, 893 F.3d 1268, 1272 (10th Cir. 2018). By contrast, delays due to negligence or crowded court dockets weigh less heavily against the government. *Seltzer*, 595 F.3d at 1177. And delays attributable to the defendant do not weigh against the government. *United States v. Abdush-Shakur*, 465 F.3d 458, 465 (10th Cir. 2006). For example, the government is not responsible for delays resulting from a defendant's continuances or motions. *See Batie*, 433 F.3d at 1291; *Banks*, 761 F.3d at 1183.

In *United States v. Seltzer*, the Tenth Circuit clarified that "awaiting the completion of another sovereign's prosecution may be a plausible reason for delay in some circumstances." 595 F.3d at 1178. But the Tenth Circuit added that "the government must make a particularized showing of why the circumstances require the conclusion of the state proceedings before the federal proceedings can continue." *Id.* That is, "[t]he mere fact that the defendant was incarcerated on a previous charge for a portion of the delay does not by itself excuse the delay." *Id.*

The *Seltzer* panel gave three reasons why a federal delay pending a state prosecution would be appropriate. First, if the federal and state charges overlapped, then a delay might "avoid conflicting motions or assertions in the different courts." *Id.* (citing *United States v. Thomas*, 55 F.3d 144, 151 (4th Cir. 1995)). Second, a delay would be excusable if concurrent proceedings would be "logistically cumbersome." *Id.*; *see also Nixon*, 919 F.3d at 1270. And third, the complexity of a charge correlates with the justifiability of a delay. *See Seltzer*, 595 F.3d at 1178.

As for pandemic-related delays, decisions from the District of New Mexico excuse the government when this district's administrative orders suspended jury trials. *See, e.g.*, *United States v. Santillanes*, No. 20-cr-01441, 2022 WL 7497291, at *5 (D.N.M. Oct. 13, 2022) ("The Government was justified in not transporting Defendant to federal court during the periods in which he could not have a federal trial because of the district's COVID-19 safety protocols."); *United States v. Gutierrez*, No. 20-cr-01570, 2022 WL 3999911, at *3-4 (D.N.M. Sept. 1, 2022); *United States v. Barela*, No. 20-cr-01228, 2021 WL 5459645, at *5 (D.N.M. Nov. 21, 2021). *But see United States v. Gomez*, No. 20-cr-01622, PACER, ECF No. 46, at 7 (D.N.M. June 10, 2022) (blaming government for delay during active administrative orders because government failed to notify defendant of federal indictment).

Even when administrative orders did not suspend jury trials from August 1 through November 17, 2020, at least one contemporaneous decision emphasized the pandemic's continuing severity. *See United States v. Leveille*, No. 18-cr-02945, 2020 WL 4698511, at *1 (D.N.M. Aug. 13, 2020) ("[T]he Court takes strong exception to Defense Counsel's implication that delays caused by the pandemic are now moot . . . ."). So too, a decision looking retrospectively at the pandemic excused a delay and did not distinguish between periods with and without active administrative orders. *See United States v. Wahhaj*, No. 18-cr-02945, 2022 WL 424996, at *3 (D.N.M. Feb. 11, 2022) (considering past two years of pandemic before concluding that "the ongoing and pervasive COVID-19 pandemic is a factor and a force that Defendant cannot use to his advantage in this analysis"). And although a different decision faulted the government for a delay without an active administrative order, this decision stressed that the government was "acting for a proper purpose, i.e., public health." *Santillanes*, 2022 WL 7497291, at *6. As a result, this decision weighed the delay only slightly against the government. *See id.*

19

To allocate responsibility for the delay, the Court divides this case's timeline and applies the above principles. *See, e.g.*, *United States v. Black*, 830 F.3d 1099, 1112-20 (2016) (employing similar methodology).

*May 12, 2020 – July 31, 2020 (81 Days)*

This period began with Mr. Warford's federal indictment. Throughout this period, Mr. Warford was in state custody, and the district court's administrative orders suspended jury trials. Admin. Order, 20-mc-00004-17, at 3; Admin. Order, 20-mc-00004-19, at 1; Admin. Order, 20-mc-00004-27, at 1.

The administrative orders made a trial impossible. Mr. Warford does not dispute this fact, but he makes two arguments why the United States is at fault. First, Mr. Warford claims that the delay "deprived Mr. Warford of notice of the pending charges, prevented him from exercising his right to counsel, and delayed the process of collecting and preserving any exculpatory evidence that may have existed at the time." ECF No. 37, at 3. Second, Mr. Warford highlights that the administrative orders did not delay all proceedings. Mr. Warford contends, "Many cases have been resolved by way of negotiated resolutions and dispositive motions during the times when jury trials were suspended. The delay in this case not only deprived Mr. Warford of his right to a speedy trial, but speedy resolution in general." *Id.*

The first argument, and to an extent the second argument, addresses prejudice rather than fault. In other words, Mr. Warford is detailing his losses—the exercise of the right to counsel, the collection and preservation of evidence, and the ability to negotiate a plea or file a dispositive motion. But these alleged losses are not reasons why the United States caused the delay. The Court will address prejudice-related arguments in its analysis of the fourth *Barker* prong.

The second argument does suggest that the United States caused the delay in trial by not moving forward with other proceedings. True enough, the United States could have initiated Mr. Warford's federal prosecution with an initial appearance and arraignment via video or telephone. *See* Admin. Order, 20-mc-00004-25, at 1-2 (filed June 26, 2020); Fed. R. Crim. P. 5(f); *see also* ECF No. 30, at 6 (demonstrating Mr. Warford's willingness to appear via Zoom for initial appearance and arraignment). And it is also true that these proceedings are necessary antecedents to a trial.

This argument fails, however, because the delay that matters for purposes of the Sixth Amendment right to a speedy trial is the delay through the beginning of trial. *See Nixon*, 919 F.3d at 1269. Even if both the initial appearance and arraignment had happened via Zoom the day after the federal indictment, and even if all discovery and pretrial motions happened in the next week, a trial still could not have occurred while the administrative orders remained active. In the end, the combination of the pandemic and the administrative orders justifies the delay during this time. Neither the United States nor Mr. Warford are responsible. *See, e.g.*, *Santillanes*, 2022 WL 7497291, at *5.

*August 1, 2020 – November 17, 2020 (109 Days)*

Mr. Warford remained in state custody for this period.

The United States offers one specific and one general excuse for this delay. *See* ECF No. 30, at 10-11. For the specific excuse, the United States asserts that this district court's administrative orders suspended jury trials during this period. *Id.*[9] More generally, the United

---

[9] The United States made this assertion for the period between May 12, 2020, and February 28, 2021. The Court analyzes the statement in the context of this subinterval, however, because the Court is not aware of an administrative order that continued or suspended trials during this time. *See* discussion *supra* n.6.

States asserts that the COVID-19 pandemic created an exigent circumstance outside of its control. *Id.* at 10.

But the United States does not identify an administrative order suspending trials during this period. Nor is the Court aware of one. A trial was hypothetically possible. *See id.* (conceding possibility of trial during different period when administrative order was not active). That said, the pandemic remained an exigent circumstance. *See Leveille*, 2020 WL 4698511, at *2 ("[T]rial scheduling is still a far cry from 'normal procedure' and the Coronavirus Pandemic still very much factors into how the Court operates and most likely, will continue to operate for at least the rest of 2020 and may be into 2021."). All in all, the Court will hold the United States only slightly responsible for this delay. *See Santillanes*, 2022 WL 7497291, at *5.

*November 18, 2020 – February 28, 2021 (108 Days)*

Mr. Warford remained in state custody. New administrative orders suspended jury trials. *See* Admin. Order, 20-mc-00004-39, at 1; Admin. Order, 20-mc-00004-49, at 2; Admin. Order, 21-mc-00004-04, at 2. As with the previous period with these same conditions, the Court holds that neither the United States nor Mr. Warford are responsible for the delay.

*March 1, 2021 – December 20, 2021 (295 Days)*

Mr. Warford remained in state custody. No active administrative order suspended jury trials. And the United States acknowledges that jury trials were hypothetically possible. *See* ECF No. 30, at 11.

The United States disclaims responsibility for the time Mr. Warford was in state custody. *See id.* at 12 ("The United States could not have known when the State was going to resolve its case against the defendant."). But the United States must do more than highlight concurrent state charges. *See Seltzer*, 595 U.S. at 1178. For example, the United States does not point to the overlap

between the federal and state charges, the logistical difficulties due to concurrent federal and state prosecutions, or the complexity of the federal charges. *Id.* Because the United States has not met its burden, the Court allocates responsibility to the United States for this delay.

At the same time, the Court limits this blame. The United States promptly arrested and arraigned Mr. Warford after learning that the State dropped its charges. The delay does not seem to be for a strategic advantage or otherwise in bad faith. *See Seltzer*, 595 F.3d at 1177. Indeed, in *Doggett v. United States*, the Supreme Court held the government responsible only for negligence despite the government's ignorance of a defendant's location for eight and a half years after the defendant's federal indictment. 505 U.S. 647, 623-52 (1992). Here, by contrast, the United States always knew Mr. Warford's location. Thus, although the Court faults the United States for this period of delay, the Court does so less heavily than it would for a deliberate or bad-faith delay.

*December 20, 2021 – January 14, 2021 (26 Days)*

Five days before this period, the State dropped its second charge against Mr. Warford. *See* ECF No. 30, at 12. Then, on December 20, 2021, the United States unsealed the indictment, arrested Mr. Warford from the state jail, and transferred Mr. Warford to federal custody. *See id.*; ECF No. 23, at 2. Proceedings moved quickly after that: Mr. Warford's initial appearance was on December 21, his arraignment was on December 23, and the Court set a February trial date on December 28. *See* ECF No. 30, at 12. Because of this swift progression, neither the United States nor Mr. Warford are responsible for this period of delay.

*January 14, 2022 – January 21, 2022 (8 Days)*

Once again, a surge in COVID-19 cases caused the district court to continue criminal jury trials. *See* Admin. Order, 22-mc-00004-10 (filed Jan. 14, 2022). As with the previous periods with active administrative orders, neither the United States nor Mr. Warford are to blame.

*January 22, 2022 – Filing of Denial on December 13, 2022 (326 Days)*

This period began with Mr. Warford moving to continue the February trial date. The Court granted this motion. And this process repeated three times more—each time, Mr. Warford moved to continue before the new trial date, and each time, the Court granted the motion. Trial is now set for February 21, 2023. *See* ECF No. 30, at 6. Mr. Warford bears responsibility for this delay, which results from his continuances. *See Batie*, 433 F.3d at 1291.

*Second-Factor Conclusion*

The responsibility for the 953-day delay is as follows. Mr. Warford is responsible for 326 days (34.2%). The United States is responsible for 404 days (42.4%), although none of this delay was deliberate or in bad faith. And no party is to blame for 223 days (23.4%).

Numbers aside, the causes for the delay also matter. *See Black*, 830 F.3d, at 1120. In *United States v. Black*, the Tenth Circuit held that "the second *Barker* factor doesn't weigh against the government at all" where the defendant was responsible for 50% of the delay, the government was responsible for 30%, and none of the government's delay was deliberate or in bad faith. 830 F.3d at 1120. And in *United States v. Gould*, the Tenth Circuit held that the second factor weighed in the defendant's favor, "but not heavily," where the defendant was responsible for 10% of the delay, the government was responsible for 90%, and none of the government's delay was purposeful. 672 F.3d 930, 937-38 (10th Cir. 2012). This case is somewhere between *Black* and *Gould*. Mr. Warford prevails on this factor, but the weight of his victory is even less than "not heavy."

### 3.    Assertion of Speedy Trial Right

The Court must next consider "whether the defendant's behavior during the course of litigation evinces a desire to go to trial with dispatch." *Batie*, 433 F.3d at 1291. While a defendant does not inherently waive his speedy trial right by failing to demand a speedy trial, the Tenth

Circuit has emphasized that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Gould*, 672 F.3d at 938 (quoting *Barker*, 407 U.S. at 532). What is more, a defendant's obligation "is not satisfied merely by moving to dismiss after the delay has already occurred." *Batie*, 433 F.3d at 1291. In sum, this "factor weighs in favor of a defendant who early, frequently, and forcefully asserts his right." *Black*, 830 F.3d at 1120.

The Court must determine when Mr. Warford knew about his federal indictment. That is, when was Mr. Warford first able to frequently and forcefully assert his right? On September 20, 2020, the State filed a nolle prosequi on Mr. Warford's first state charge. The State justified its decision to drop the charge by explaining, "Defendant is currently being prosecuted federally." ECF No. 23-4, at 10. Most importantly, the state district attorney certified that a copy of the nolle prosequi was provided to Mr. Warford's counsel.

Mr. Warford contends that the nolle prosequi does not establish notice. He asserts that this case is like *United States v. Vaughan*, 643 F. App'x 726 (10th Cir. 2016). The defendant in *Vaughan* was in custody in the District of Nevada. The government from the District of Kansas sent the District of Nevada a detainer. *Id.* at 727 n.1. But that fact did not establish the more important one: that the defendant "was notified of any such detainer, or otherwise knew of the indictment." *Id.* at 730 n.4. The Tenth Circuit held that the defendant was not on notice of the indictment. *Id.* at 730 & n.4 (citing *United States v. Watford*, 468 F.3d 891, 906 (6th Cir. 2006), *overruled on other grounds by Alleyne v. United States*, 570 U.S. 99 (2013)).

Here, if the United States sought to establish notice with the federal detainer sent to the state facility, then *Vaughan* would control. But the United States has more: the certification that Mr. Warford's attorney received the nolle prosequi. Two other cases provide better comparisons.

In *United States v. Frias*, the defendant faced state charges. 893 F.3d 1268, 1271 (10th Cir. 2018). While state proceedings were pending, federal authorities also indicted the defendant. *Id.* The federal indictment was sealed. *Id.* At some point, the defendant's state counsel talked with an Assistant United States Attorney. *See id.* at 1273. When the defendant later asserted the right to a speedy trial, the government argued that the conversation established notice. *See id.* The Tenth Circuit rejected this argument: "even if she had general knowledge that charges were looming, the government never actually made her aware that charges existed." *Id.*

On the other side is *United States v. Nixon*. 919 F.3d 1265 (10th Cir. 2019). The defendant was in state custody for state murder and firearm charges. *Id.* at 1268, 1270. He had counsel for these charges. *See id.* at 1272. Federal authorities then indicted the defendant for a federal firearm crime. *See id.* After learning of the federal indictment—which was unsealed—state authorities moved to dismiss the state firearm charge. *See id.* Their motion explained that the defendant was "being federally charged." *Id.* The defendant did not have counsel for the federal charge at that time. *Id.* The district court held that the defendant had notice of the federal charge. *Id.* The Tenth Circuit affirmed, noting that the district court's holding was not clearly erroneous. *See id.*

*Nixon* is the closer match. True, *Nixon*'s indictment was unsealed, even though the indictment was sealed here and in *Frias*. But other facts—specifically the notice provided in the state motion to dismiss and the representation of state counsel—are present here. The Court thus holds that Mr. Warford had notice of his federal indictment on September 20, 2020.

Mr. Warford first asserted his speedy trial right in July 2022—twenty-two months after receiving notice of a pending federal indictment. This was too long of a wait. *See Black*, 830 F.3d at 1120 (holding third *Barker* factor "weighs heavily" against defendant where defendant waited sixteen months to assert right); *United States v. Margheim*, 770 F.3d 1312, 1329 (10th Cir. 2014)

(holding third *Barker* factor "weighs in favor" of government where defendant waited nineteen months). This factor weighs against Mr. Warford.

### 4.     Prejudice

Unless there is evidence of extreme delay—which is not present here—the defendant has the burden of showing prejudice. *See Black*, 830 F.3d at 1121-22; *United States v. Hicks*, 779 F.3d 1163, 1168 (10th Cir. 2015) ("Generally, we require a delay of at least six years before the defendant is relieved of his burden to present specific evidence of prejudice."). Prejudice is assessed "in light of the interests that the speedy trial right was designed to protect." *Seltzer*, 595 F.3d at 1179. These interests include: (i) prevention of oppressive pretrial incarceration; (ii) minimization of anxiety and concern of the accused; and (iii) minimization of the possibility that the defense will be hindered or impaired. *Id.*

#### a.     *Prevention of Oppressive Pretrial Incarceration*

Mr. Warford asserts that his "pretrial incarceration was extended." *See* ECF No. 23, at 11. But he does not explain how. Mr. Warford had a pending state charge—for which he remained in state, pretrial incarceration—until December 16, 2021. The United States promptly transferred Mr. Warford to federal custody on December 20, 2021. And within the next week, Mr. Warford had his initial appearance, arraignment, and detention hearing. Thus, Mr. Warford has not met his burden to show that any delay in his federal trial extended his pretrial incarceration.

#### b.     *Minimization of Anxiety and Concern of the Accused*

Mr. Warford does not assert that he suffered any specific anxiety or concern. *See id.*; ECF No. 37, at 5.

c.     *Minimization of the Possibility that the Defense Will Be Hindered or Impaired*

Mr. Warford offers several related harms that the delay caused. First, Mr. Warford claims that he was denied assistance of counsel from the date of indictment. *See* ECF No. 23, at 11. Included in this first reason—Mr. Warford says—is the lost opportunity to collect and preserve exculpatory evidence. *See* ECF No. 37, at 3. Second (or because of the first reason), Mr. Warford continues that he lost the opportunity to invoke his rights under the STA or the IADA. *See* ECF No. 23, at 11. Mr. Warford's third alleged harm is that he was "prevented from being released from state custody due to the federal detainer." *Id.* at 5. And fourth, in Mr. Warford's view, the government deprived him of not only his right to a speedy trial but also to a speedy resolution in general, perhaps through a plea bargain or dispositive motion. *See id.*

Mr. Warford cites *Seltzer* to support his first claim of prejudice—that the delay deprived him of assistance of counsel. *See* ECF No. 23, at 11 (citing 595 F.3d at 1179-81). But reliance on *Seltzer* presents two problems: first, the specific harms that were present in *Seltzer* are not present here, and second, the Tenth Circuit has since cabined *Seltzer*.

In *Seltzer*, the delay added to the defendant's pretrial incarceration because a pending federal detainer prevented the defendant from posting bond in the state case. The federal government's hesitation to bring the defendant to federal court therefore caused harm—the delay ensured that the defendant would remain in jail until the federal prosecution commenced. *See id.* at 1180. What is more, government attorneys hampered the defense during the delay by appearing *ex parte* before the magistrate judge and seeking cooperation from the defendant's accomplice. *See id.* These harms are not present here.

*Seltzer*'s prejudice analysis concluded by noting that, because of the delay in the defendant's initial appearance, the defendant lost the chance to invoke his rights under the Speedy

Trial Act at an earlier time. *Id.* Since *Seltzer*, however, the Tenth Circuit clarified that a wait to assert a statutory speedy trial clock right "is implicit in any delay and therefore fails to establish the requisite prejudice necessary to trigger a constitutional delay"—especially when the defendant cannot show any lost opportunities. *Frias*, 893 F.3d at 1274. The Tenth Circuit continues to uphold the reasoning in *Frias* that distinguishes *Seltzer*, making clear that "the lost opportunity to invoke the Speedy Trial Act constituted prejudice in *Seltzer* only because the defendant had shown other lost opportunities for his defense during the delay period." *Nixon*, 919 F.3d at 1277.

Here, Mr. Warford does not show how his delay in receiving counsel impaired any trial defense. An initial problem with Mr. Warford's argument is that he *did* have counsel, even if only for his state charge. *See* ECF No. 23-4, at 1. To be sure, representation for the state and federal charges would focus on different arguments and investigatory efforts. *See United States v. Battis*, 589 F.3d 673, 683 (3d Cir. 2009). But Mr. Warford needs to show prejudice resulting not only from a lack of representation in general but from a lack of representation for his federal charge in particular.

Mr. Warford does not meet this burden. Although Mr. Warford states that he lost the opportunity to collect and preserve evidence, he does not name any evidence that might have been lost. *See Frias*, 893 F.3d at 1273 ("We have held that a defendant should show 'that the delay resulted in the loss of specific evidence or the unavailability of certain witnesses.'" (citing *Hicks*, 779 F.3d at 1169)). Mr. Warford thus fails to establish an impairment to his defense.

Mr. Warford's second alleged harm from the delay—perhaps because of his delay in receiving counsel—is that he lost the opportunity to assert his rights under the STA and the IADA. As described in the statutory analysis, however, Mr. Warford does not show how he lost rights under these statutes. *See* discussion *supra* Section II.A. He does not rebut the United States'

calculation that the STA's seventy-day clock for a trial's commencement has not expired. *See* ECF No. 30, at 6-8. And Mr. Warford is incorrect if he argues that he could use the IADA—which applies to *sentenced* prisoners—to force an arraignment. *See Wilson*, 719 F.2d at 1494-95.

Perhaps Mr. Warford's argument is that if the United States had arraigned him sooner, then the seventy-day clock would have started earlier, and then it would have since expired—thus giving him a statutory right to dismissal. *See* 18 U.S.C. § 3161(c). But a delay in starting the STA's speedy-trial clock right "is implicit in any delay and therefore fails to establish the requisite prejudice necessary to trigger a constitutional delay." *Frias*, 893 F.3d at 1274.

Mr. Warford's third alleged harm is that the federal detainer prevented him from being released from state custody. Mr. Warford was in state, pretrial custody for his receipt-or-transfer charge until December 16, 2021. But he does not explain how the federal detainer prevented his pretrial release during this custodial period. Mr. Warford does not, for example, offer facts to analogize his case to *Seltzer*. *See* 595 F.3d at 1174 ("[The defendant's bail bonds agent] Ms. Ottinger offered funds that should have been sufficient to secure his release on bond. The Mesa County jailer, however, informed Ms. Ottinger that [the defendant] Mr. Seltzer was under a federal detainer pending counterfeiting and weapons charges and refused to release him.").

Mr. Warford's final alleged harm is that the United States not only deprived him of the right to a speedy trial but also denied him a speedy resolution. This is not a harm that can result in a constitutional violation. The Constitution does not provide a general right to the speedy resolution of cases. *See Lafler v. Cooper*, 566 U.S. 156, 168 (2012) ("It is, of course, true that defendants have 'no right to be offered a plea . . . nor a federal right that the judge accept it.'" (alteration in original) (quoting *Missouri v. Frye*, 544 U.S. 134, 148 (2012))).

At bottom, Mr. Warford has not shown prejudice specific to his case. The fourth *Barker* factor thus favors the United States.

### 5.      Conclusion to Constitutional Analysis

The first two factors slightly favor Mr. Warford. The United States, however, prevails on the third and fourth factors. The Tenth Circuit is "generally reluctant to find a speedy trial violation without prejudice." *Frias*, 893 F.3d at 1275 (quoting *Gould*, 672 F.3d at 939). And in this case, the most important factor—prejudice to the defendant—is absent. After balancing the factors, the Court finds that there was no unconstitutional delay. *Cf. Frias*, 893 F.3d at 1275.

### C.      Conclusion to Speedy Trial Analysis

The United States violated neither Mr. Warford's statutory nor constitutional right to a speedy trial. The Court thus denies Mr. Warford's motion to dismiss for a violation of these rights.

## III.      Identification of Mr. Warford

If law enforcement arranges a pretrial identification procedure that creates "a very substantial likelihood of irreparable misidentification," then the Fifth Amendment's Due Process Clause bars in-court identifications and testimony about the pretrial identification in a federal criminal trial. *Snow v. Sirmons*, 474 F.3d 693, 720 (10th Cir. 2007) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)); *see Perry v. New Hampshire*, 565 U.S. 228, 248 (2012). A two-prong test determines whether to suppress allegedly unreliable eyewitness identifications. *See Perry*, 565 U.S. at 238-39. First, a court asks whether the challenged identification procedures were unnecessarily suggestive. *See id.* If so, the court asks whether the resulting identification is "nevertheless reliable in view of the totality of the circumstances." *United States v. Sanchez*, 24 F.3d 1259, 1261-62 (10th Cir. 1994).

Only if the Court answers both questions in the affirmative—that is, if the identification procedures are unnecessarily suggestive and the identification is so unreliable that it would be unfair to present it to the jury—will the court suppress an eyewitness identification. *Snow*, 474 F.3d at 720 ("When a pretrial identification occurs under impermissibly suggestive circumstances and the in-court identification of the witness is unreliable, the identification should be excluded."). A defendant has the burden to show by a preponderance of the evidence that the lineup was unnecessarily suggestive. *English v. Cody*, 241 F.3d 1279, 1282 (10th Cir. 2001); *see also United States v. Harty*, 476 F. Supp. 2d 17, 24 (D. Mass. 2007) (providing preponderance standard). If the defendant meets this burden, then the government has the burden to show by clear and convincing evidence that the identification was still reliable. *English*, 241 F.3d at 1283; *see also United States v. Wade*, 388 U.S. 218, 240 (1967) (providing clear-and-convincing evidence standard); *United States v. Martin*, 203 F.3d 236, 2000 WL 33526, at *2 (10th Cir. 2000) (unpublished table opinion) (same); *Harty*, 476 F. Supp. 2d at 24 (same).

**A.    Suggestive**

"[A] number of factors may be relevant in determining whether the array was improperly suggestive. These include 'the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves.'" *United States v. Wiseman*, 172 F.3d 1196, 1208 (10th Cir. 1999) (quoting *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir. 1994)), *abrogated on other grounds by Rosemond v. United States*, 572 U.S. 65 (2014).

An array with six or fewer photos is "not *per se* a due process violation," but it "is a factor affecting the weight we give to the irregularities in the array." *Id.* at 1209 (holding six-photo array impermissibly suggestive); *see United States v. Kamahele*, 748 F.3d 984, 1020 (10th Cir. 2014) (same); *Cf. Sanchez*, 24 F.3d at 1263 (holding six-photo array not impermissibly suggestive).

Irregularities carry more weight in arrays with fewer photos because the "low number of photos in the array cannot dilute the 'suggestive irregularities' of the array." *Wiseman*, 172 F.3d at 1209.

This case supports the thesis that irregularities loom larger with fewer photos. Officer Perea used a five-photo array. Only two of the photos have the traditional mugshot background—a white wall with black height scales. This was significant to R.F. After waffling between selecting a photo and expressing uncertainty, R.F. described the subject in Photo 5, "He is the right height." The subject's forehead is somewhere between the 5'4" and 5'8" marks in the photo. The subject in Photo 1, by contrast, is over 5'8." And Photos 2, 3, and 4 do not have height scales. Thus, if R.F. was relying on height, there was only one real comparison.

The procedure was suggestive for other reasons. Officer Perea allowed the couple to work together. Neither witness definitively identified a photo before the suggestion of the other. L.P. began with, "I feel like none of those look like him." R.F. then came close to identifying a photo. Looking at either Photo 3 or Photo 5, R.F. said, "I feel like he looks similar, but . . . ." Only then did L.P. identify Photo 5. Because L.P. entered the room during the procedure, Officer Perea had not yet warned L.P. that the suspect might not be in the photo array. *See also* Thomas D. Albright & Brandon L. Garrett, *The Law and Science of Eyewitness Evidence*, 102 B.U. L. Rev. 511, 537 (2022) ("Instructions should inform the eyewitness that a culprit may or may not be present in the lineup. That instruction is crucial because eyewitnesses otherwise may expect that the culprit will be present and that there is a correct choice that should be made." (citing Nat'l Rsch. Council, *Identifying the Culprit: Assessing Eyewitness Identification* 107 (2014))). And R.F.'s first identification ("I feel like that one too.") followed L.P.'s.

Officer Perea himself warned, "They [presumably, a court] may question [the procedure with two eyewitnesses] down the road. But no worries. We'll deal with that bridge when we cross

it, you know? It's not like I coordinated you [L.P.] coming out." Officer Perea was correct. The identification with two witnesses was suggestive and unnecessarily so—Officer Perea could have asked L.P. to wait outside the room when she first entered.

More than that, the procedure was not blind or double-blind. Officer Perea knew which photograph contained the suspect, and he knew which photograph the witness was studying. Officer Perea testified candidly that he "traditionally" arranges photo arrays by placing the suspect's photo in the first or last position. Tr. Hr'g 58. Later, Mr. Warford's counsel asked Officer Perea whether blinding is important because "there can't be any kind of cues given one way or another even if it is not intentional?" Tr. Hr'g 68. Officer Perea answered, "Exactly." *See id.*; *see also* Albright & Garrett, *supra*, at 522 (noting that in study of 250 DNA exonerations in United States, 161 cases involved eyewitness evidence, and 160 of those 161 cases did not use blind or double-blind procedures).

Mr. Warford contends that "the officer's encouragement of an identification" was one reason why the procedure was unnecessarily suggestive. *See* Mot. to Suppress Identification 5 (ECF No. 38). The Court need not decide whether Officer Perea intentionally encouraged an identification. Because Officer Perea gave verbal and non-verbal responses to the witnesses throughout the procedure, the risk of unintentional cues was present. Here are some examples:

- When R.F. and L.P. noted their opinion that the perpetrator had blue eyes, Officer Perea asked, "were they really blue?"

- When R.F. said, "I feel like I'm going to go with five. Number five.," Officer Perea asked, "Want to go with resembles him? Or? Like what do you feel comfortable with?"

- When R.F. said that he did not feel comfortable pointing out the wrong guy, Officer Perea said, "And, you know, like we tell you, you don't have to be certain. This is just part of the investigation."

- When R.F. said that he wished he could see the arms or hands of the subject in Photo 5, Officer Perea said, "Yeah, they make it tough, man."

- When R.F. said he was "pretty positive" that the subject in Photo 5 was the perpetrator, Officer Perea said, "You want to say you're pretty positive it's him?"

- When Officer Perea instructed R.F. to initial his selection on the identification form, Officer Perea pointed to the two blanks for the choice of a positive identification.

These responses, or others, may have unintentionally led R.F. to his positive identification of Photo 5. *See also* Nat'l Rsch. Council, *supra*, at 106 ("Even when lineup administrators scrupulously avoid comments that could identify which person is the suspect, unintended body gestures, facial expressions, or other nonverbal cues have the potential to inform the witness of his or her location in the lineup or photo array."). And the unblinded procedure was unnecessary—Officer Perea could have employed a blind or double-blind procedure, such as the folder-shuffle method. *See* ECF No. 24, at 6.

To sum up, the facts of this procedure—the inclusion of only five photos, the absence of height scales in three photos, two witnesses working together, the officer's knowledge of which photo contained the suspect, the officer's knowledge of the witnesses' examination, and the officer's responses to the witnesses—render the procedure unnecessarily suggestive. Mr. Warford met his burden, which now shifts to the government. *See English*, 241 F.3d at 1283.

B.    **Reliable**

Once a defendant shows that police employed impermissibly suggestive procedures, "[t]he totality of the circumstances must be considered to determine whether sufficient independent basis for the identification leads one to conclude that the identification is [nonetheless] reliable." *Snow*, 474 F.3d at 720 (quoting *United States v. Williams*, 605 F.2d 495, 498 (10th Cir. 1979)). In *Neil v. Biggers*, the Supreme Court listed factors to consider:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Brathwaite*, 432 U.S. at 114 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)); *see also Kamahele*, 748 F.3d at 1020-21.

The record is sparse for the first and second factors. At the evidentiary hearing, the Court asked Mr. Warford's counsel whether the record has information about the victims' opportunity to view the perpetrator. Tr. Hr'g 89. Mr. Warford's counsel said no. *Id.* Counsel for the United States later volunteered that the record showed a six-day interval between the carjacking and the identification. *Id.* at 98. But the interval gets at the third *Biggers* factor—not the first two.

Some facts may still be gleaned. First, R.F. presumably saw the perpetrator twice—once when he first left his car, and a second time when he returned to the car. Second, R.F. could hear the perpetrator claim to be tired from jogging. Third, R.F. could see what the perpetrator was wearing—a baseball cap and a hooded jacket with the hood up. And fourth, R.F. and L.P. ostensibly had an adequate view of the perpetrator to develop opinions about the perpetrator's eye color, height, tattoos, and skin tone.

But the first three facts do not count for much. The facts about seeing the perpetrator twice and hearing the perpetrator are from the redacted state arrest warrant affidavit. *See* ECF No. 23-2,

at 1. The United States did not reference the affidavit at the evidentiary hearing. Nor did the United States proffer any evidence to bolster these facts. And the fact about the baseball cap and hooded jacket is from another officer's notes that Officer Perea merely alluded to at the evidentiary hearing. *See* Tr. Hr'g 64-65, 79.

So too, the Court affords little weight to the fact about the witnesses' view of identifying traits. Recall that the couple posted about the carjacking on Facebook, and someone on Facebook shared a video of another carjacking. The record is silent about when the witnesses first viewed the Facebook video. And this creates uncertainty about the source(s) of the witnesses' opinions about the perpetrator's eye color, tattoos, and skin tone.

R.F. described the perpetrator's clothes and height during a 911 call on February 16, 2020. Tr. Hr'g 79. The record is silent about the other traits that R.F. described in this 911 call. Four days later, after the police arrested Mr. Warford on February 20, 2020, R.F. described the perpetrator's race and tattoos. *See* ECF No. 23-1, at 1. Because the record does not establish the source of the witnesses' opinions about Mr. Warford's eye color, tattoos, and skin tone, the Court cannot assume that the witnesses were close enough to the perpetrator to see these traits during the encounter.

Other uncertainties abound. The United States insists that "[t]he victim had ample opportunity to closely observe the defendant during the carjacking." Mot. to Suppress Identification 8 (ECF No. 31). But the United States does not meet its burden to prove this conclusion with evidence of the victims' distance from the perpetrator, the length of the encounter, the amount of lighting, the victims' attention on the perpetrator's face rather than on his knives, and the visibility of the perpetrator's face despite the baseball cap and the sweatshirt's raised hood. *Cf. Brathwaite*, 432 U.S. at 114 (finding reliability where witness saw perpetrator twice, for two-to-three minutes, within two feet, and under natural light); *Biggers*, 409 U.S. at 200 (finding

reliability where victim saw perpetrator for up to half an hour, with artificial light or moonlight, and facing perpetrator "directly and intimately"); *United States v. Worku*, 800 F.3d 1195, 1205-06 (10th Cir. 2015) (finding reliability where witness saw perpetrator four-to-five times almost every day for seven-to-eight months); *Kamahele*, 748 F.3d at 1021 (finding reliability where witnesses saw perpetrators for one minute and within eight feet); *United States v. Klein*, 93 F.3d 698, 702 (10th Cir. 1996) (finding reliability where witness and perpetrator held three meetings, all at least ten-minutes long, at which witness and perpetrator negotiated and conducted drug deals); *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992) (finding reliability where witnesses saw perpetrator within a few feet, for several minutes, and with good lighting). The United States cites no case with a reliable identification and so few facts about the first two *Biggers* factors.

As for the third *Biggers* factor, R.F. and L.P.'s prior descriptions reveal inaccuracies. During the photo array, the witnesses stated that the perpetrator has "really blue" eyes. But Mr. Warford's eyes are green, not blue. *See* Government Ex. 1, at 11 (copy of offender booking sheet). And in a 911 call, R.F. reported that the perpetrator was 5'9". Mr. Warford, by contrast, is 5'6". *See id.* These inconsistencies may not be major, but they cut against reliability.

Related to accuracy, R.F.'s prior descriptions were imprecise. During the photo array, R.F. described the subject in Photo 5: "He is the right height, though." But the height scales in Photo 5 show someone who is 5'6". And Photo 1—the only other photo with height scales—shows someone who is 5'9". *See* ECF No. 24-1, at 1. R.F.'s own descriptions of the suspect's height thus changed between the 911 call and the photo array.

For the fourth *Biggers* factor, the witnesses evinced uncertainty at the confrontation:

- L.P.'s first comment: "I feel like none of those look like him."

- R.F.'s comment, after L.P.'s initial identification, that "It's very close. I'm not one-hundred percent positive, but there is a thing right here."

- R.F.'s reference of the identification form's option to choose a photo that "resembles the offender" with the caveat that the witness "is not positive." R.F. abandoned this option after confirming that this selection would not be a positive identification.

- R.F.'s and L.P.'s belief that the eye color in Photo 5 did not match their memories.

- R.F.'s request to compare Photo 5 with a video from Facebook.

- R.F.'s stated discomfort: "I don't feel comfortable with pointing out the wrong guy."

- R.F.'s desire to see the subject's arms and hands.

It is true that R.F. and L.P. made several statements that identified the subject in Photo 5. But these statements all came with qualifications. For example, L.P. followed the statement, "Yeah probably that one," with, "But he just looked skinnier." R.F.'s final statement, "Yeah, I'm pretty positive it's him," does not elicit confidence. And to support his choice, R.F. did not offer an expression of certainty but said, "I get a weird feeling when I look at him. The other guys, I don't care." This fourth factor—the level of certainty demonstrated at confrontation—cuts against reliability.

Fifth, the identification procedure occurred only six days after the attack on R.F. This factor weighs strongly for reliability. *See, e.g.*, *Kamahele*, 748 F.3d at 1021 (finding reliability where confrontation occurred three months after crime).

All in all, factors one and two are neutral as to the victims' opportunity to see the perpetrator or their attention on the perpetrator. Factors three and four reflect inaccuracy and uncertainty. Only factor five—the time between crime and confrontation—cuts for reliability.

### C.      Conclusion to Identification Analysis

*Manson v. Brathwaite* calls for a balancing of the reliability against the "the corrupting effect of the challenged identification." *Brathwaite*, 432 U.S. at 116. *Brathwaite* involved an identification procedure—a single photo left at the witness's office—that was perhaps more suggestive than the present one. *See id.* at 101, 109. At the same time, the *Brathwaite* identification was perhaps more reliable than the present one—that witness saw the perpetrator twice, for two-to-three minutes, within two feet, and with natural light illuminating the encounter. *See id.* at 114-15. The *Brathwaite* Court concluded that reliability outweighed suggestiveness partially because the investigating officer was not present when the witness made the out-of-court identification. *See id.* at 16 ("And since [Witness] Glover examined the photograph alone, there was no coercive pressure to make an identification arising from the presence of another.").

This fact cuts the opposite way here. The two witnesses worked together. An officer responded to the witnesses throughout the procedure. And because only one of the *Biggers* factors—time between crime and confrontation—supports reliability, the Court holds that the unnecessary suggestiveness of the photo array outweighs the reliability of any identification.

The United States urges the Court to still allow in-court identifications. In short, the United States contends that cross-examination can prevent any misidentification from becoming irreparable. *See* ECF No. 31, at 10-11. The United States cites *United States v. Thomas* for support. *See id.* at 10 (citing 849 F.3d 906, 910-11 (10th Cir. 2017)). But *Thomas* does not apply.

*Thomas* addressed whether an in-court identification violated due process when the witness had not made a prior, out-of-court identification of the defendant. *See* 849 F.3d at 910. The Tenth Circuit held that due process does not require a judicial reliability assessment of a witness whose

first identification is made in court—at least where the suggestiveness is not the fault of improper conduct by police or prosecutors.[10] *See id.* at 910.

R.F. and L.P., unlike the witness *Thomas*, made pretrial identifications. The risk here is that the suggestive procedure will influence R.F.'s and L.P.'s memory of the carjacking. Because the United States fails to show that the reliability of the witnesses' memory outweighs "the corrupting effect of the suggestive identification," admitting testimony about the pretrial procedure and in-court identifications creates "a very substantial likelihood of irreparable misidentification." *Brathwaite*, 432 U.S. at 114, 116 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). And that would violate the process due to Mr. Warford.

This case comes down to the assignment of burdens—a type of judicial tiebreaker. Admittedly, the Court found only a few cases that suppress identifications. *See, e.g.*, *United States v. Emanuele*, 51 F.3d 1123 (3d Cir. 1995) (excluding in-court identification where witness failed to make pretrial identification and, while waiting to testify outside courtroom, witnesses told each

---

[10] The *Thomas* Court relied on *Perry v. New Hampshire*. *See Thomas*, 849 F.3d at 910 (citing *Perry*, 565 U.S. at 248). *Perry* held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." 565 U.S. at 248. Said otherwise, to trigger *Brathwaite*'s balancing of suggestiveness against reliability, the suggestiveness must be the fault of law enforcement. *See id.* at 241. *Thomas* found the suggestiveness of the in-court identification to be the consequence of where defendants customarily sit in a courtroom and not of any improper conduct by law enforcement. *See* 849 F.3d at 910.

The United States does not contend here that, as in *Perry*, the due process clause is not triggered because law enforcement was not responsible for suggestiveness of the identification procedure. As described above, Mr. Warford proffered several reasons—due to improper law enforcement conduct—why the photo array was unnecessarily suggestive. The United States does not argue that the photo array would have been appropriate in the absence of L.P.'s entrance. Nor does the United States argue that law enforcement is blameless for L.P.'s continued presence. Any such arguments are therefore waived. *See United States v. Hardwell*, 80 F.3d 1471, 1492 (10th Cir. 1996).

other "it has to be him" when defendant walked by in shackles). Yet the Court did not find cases with reliable identifications and so few facts about a witness's opportunity to observe a perpetrator.

Consider that this case's encounters between the victims and the carjacker could have lasted one minute, within eight feet, and with decent lighting. Or the encounters could have lasted only one second, in almost total darkness, with the perpetrator standing far from the victims, and with a hood covering any facial features. To repeat, the record is nearly silent.

The United States had the burden to show that the encounter was closer to the former hypothetical rather than the latter. *See English*, 241 F.3d at 1283. And the United States failed to show by clear and convincing evidence, or even by a preponderance of the evidence, that the victims' prior identifications were reliable. *See Wade*, 388 U.S. at 240; *Martin*, 2000 WL 33526, at *2; *Harty*, 476 F. Supp. 2d at 24. The tiebreak favors Mr. Warford.

Because Mr. Warford has shown that the photo array was unnecessarily suggestive, but the United States has not offered sufficient indicia of reliability to outweigh the suggestiveness, the Court will suppress testimony about the pretrial identification and exclude any in-court identifications by R.F. and L.P.

## IV.    Physical Evidence and Statements

The Fourth Amendment commands that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *Lange v. California*, 141 S. Ct. 2011, 2017 (2021). A "reasonableness" standard thus governs the constitutionality of seizures. *Id.* And in *Payton v. New York*, the Supreme Court held that warrantless arrests inside a home—even with probable cause—are presumptively unreasonable. 445 U.S. 573, 586 (1980). Certain exceptions, however, may overcome this presumption of unreasonableness. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

A burden-shifting framework accompanies this presumption-with-exceptions framework. On a motion to suppress, a defendant carries the burden to show that officers' actions implicated the Fourth Amendment. *See United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020). Then the government "bears the burden of justifying warrantless police actions." *United States v. Kendall*, 14 F.4th 1116, 1122 (10th Cir. 2021). As for the standard for reviewing evidence, "the district court must assess the credibility of witnesses and determine the weight to give to the evidence presented; the inferences the district court draws from that evidence and testimony are entirely within its discretion." *Goebel*, 959 F.3d at 1265 (citing *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007); *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004)).

## A.     Standing

The United States raises a preliminary issue: Mr. Warford "must demonstrate his standing to invoke the protections of the Fourth Amendment." ECF No. 32, at 7. As the United States correctly recites, "It is fundamental law that a person desiring to have evidence suppressed must first show that he has standing to object to the *search*." *Id.* (emphasis added) (quoting *United States v. Deninno*, 29 F.3d 572, 576 (10th Cir. 1994)). So too, the United States correctly identifies that the burden to show standing belongs to Mr. Warford. *Id.*

All of this may be true in general, but the United States' discussion about Mr. Warford's subjective and reasonable expectations of privacy in the place to be searched is misplaced. *See* ECF No. 32, at 8. Mr. Warford does not protest the search of someone else's apartment. He protests the *seizure of his own person.* And Mr. Warford has "Fourth Amendment interests in challenging his own seizure." *See United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989). He meets this burden, almost by default.

But perhaps the United States does not challenge Mr. Warford's standing to challenge his seizure. Instead, perhaps the United States challenges Mr. Warford's invocation of *Payton*'s presumption that warrantless seizures inside the home are unreasonable. The United States suggests the following: (1) Mr. Warford did not own the apartment, (2) the owner of the apartment expelled Mr. Warford from the apartment, and thus (3) the police could arrest Mr. Warford without a warrant inside the apartment to enforce the expulsion. *See* ECF No. 32, at 8.[11] To support this argument, the United States cites three cases in which *Payton* did not protect unlawful occupants— that is, cases in which courts upheld warrantless seizures against people wrongfully present on premises. *See United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (person squatting in vacant house); *United States v. Rambo,* 789 F.2d 1289, 1295-96 (8th Cir. 1986) (person remaining in hotel room after eviction); *United States v. Gutierrez-Casada*, 553 F. Supp. 2d 1259, 1271 (D. Kan. 2008) (undocumented immigrant with deportation order).

Mr. Warford rebuts the United States. He contends that he "was not 'justifiably expelled,' evicted, or asked to leave the premises by anyone who had authority over it." Def.'s Reply 2 (ECF No. 39). Officer Lopez's testimony reflects minor uncertainty about Mr. Warford's legal status in the apartment. On the one hand, Officer Lopez acknowledged that no one told him that Mr. Warford did not live in the apartment. Tr. Hr'g 33. Nor did anyone tell Officer Lopez that Mr. Warford was evicted from the apartment for any reason. *Id.* Officer Lopez even told Mr. Warford that he would search "*your* apartment." Def.'s Ex. F, at 3:15. On the other hand, Officer Lopez

---

[11] The United States does not argue that an arrest warrant is unnecessary (even without exigency) when police arrest a lawfully present occupant in a third party's home. Put differently, the Court understands the United States to argue that Mr. Warford's invocation of *Payton* was improper *because of* Mr. Warford's unlawful presence; the Court does not understand the United States to argue that Mr. Warford's invocation of *Payton* was improper *despite* Mr. Warford's lawful presence. *See* ECF No. 32, at 8. As a result, the Court addresses only the former. The latter argument is waived. *See United States v. Hardwell*, 80 F.3d 1471, 1492 (10th Cir. 1996).

testified that he heard a different occupant claim to live in the apartment. Tr. Hr'g 18. And Officer Lopez said that the other occupant asked Mr. Warford to exit the apartment after the officers told Mr. Warford that they would get a search warrant if Mr. Warford did not step outside. *Id.*

On balance, Mr. Warford was lawfully present when he was arrested. Even if someone else lived in the apartment, the evidence suggests that Mr. Warford was a social guest or co-resident. At the beginning of the encounter, nothing indicated that a lawful occupant or owner was trying to evict Mr. Warford. And even if the other occupant—with the necessary authority to do so—asked Mr. Warford to leave, this request would have followed the moment when the officers placed Mr. Warford under arrest. *See* discussion *infra* Section IV.B (identifying moment of arrest). Standing does not thwart his claim.

### B.    Warrantless Arrest

#### 1.    Legal Background

Officers seize a person "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). But not all police encounters—such as ones on a departing bus or inside a home—can terminate with a person leaving. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 435 (1991). In those cases, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 436.

To be sure, "police officer[s] not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). But a knock-and-talk encounter can shed its consensual—and constitutional—nature. *See United States v. Reeves*, 524 F.3d 1161, 1166 n.4 (2008) (contemplating such a case). At some point, a reasonable person may

no longer feel free to shut the door on police officers who lack a warrant but command the person

to step outside. The Tenth Circuit views such a seizure as a warrantless arrest *inside* the home—

thus triggering *Payton*'s presumption of unreasonableness.[12] *See, e.g.*, *id.* ("[I]t is the location of

the arrested person, and not the arresting agents, that determines whether an arrest occurs within a

home." (quoting *United States v. Maez*, 872 F.2d 1444, 1451 (10th Cir. 1989))).

A totality-of-the-circumstances approach and a categorical approach can inform when

police outside of a home arrest someone inside. *Compare United States v. Thomas*, 430 F.3d 274,

277 (6th Cir. 2005) (considering totality of the circumstances), *and United States v. Al-Azzawy*,

784 F.2d 890, 893 (9th Cir. 1985) ("Whether an arrest has occurred 'depends on all of the

surrounding circumstances . . . .'" (quoting *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir.

1981))), *with United States v. Allen*, 813 F.3d 76, 88-89 (2d Cir. 2016) (recognizing arrests

"regardless of whether the police 'constructively' or 'coercively' entered the apartment through

shows of force or authority beyond that conveyed by the simple command to the occupant to

submit to arrest").

Tenth Circuit opinions offer conflicting guidance on the Circuit's approach. On the one

hand, *United States v. Reeves* used categorical language. The *Reeves* panel majority recited,

"Opening the door to one's home is not voluntary if ordered to do so under color of authority."

524 F.3d at 1167. In the next paragraph, the opinion continued, "Further, this court has held that

if an individual's decision to open the door to his home to the police is not made voluntarily, the

---

[12] Not all circuits view this type of seizure as a warrantless arrest inside the home. *See, e.g.*, *Gaddis v. DeMattei*, 30 F.4th 625, 633 (7th Cir. 2022); *Knight v. Jacobson*, 300 F.3d 1272, 1277 (11th Cir. 2002) ("*Payton* keeps the officer's body outside the threshold, not his voice. It does not prevent a law enforcement officer from telling a suspect to step outside his home and then arresting him without a warrant."). *But see also United States v. Jerez*, 108 F.3d 684, 691-93 (7th Cir. 1997) (analyzing situation where police coerce person outside home as a *Terry* stop rather than as a warrantless arrest inside home).

individual is seized inside his home." *Id.* at 1168. These sentences distill into a syllogism. If police acting under color of authority order someone to open the door to that person's home, and the person does so, then the person is seized in the home.

Judge Tymkovich's concurrence is instructive of the Tenth Circuit's approach. Judge Tymkovich criticized the panel majority for using a categorical approach. *Id.* at 1171 (Tymkovich, J., concurring) ("Under the majority's formulation, [whether a constructive entry occurs] submits to a bright line rule: any 'show of force' that induces a suspect to leave the home—whether or not excessively coercive—is tantamount to formal arrest regardless of the circumstances."). And since *Reeves*, the Tenth Circuit returned to categorical language. *See, e.g.*, *Storey v. Taylor*, 696 F.3d 987, 993 (10th Cir. 2012) ("[A] sufficiently coercive order requiring an individual to leave his own house counts as a seizure subject to the protections of the Fourth Amendment.").

On the other hand, the Tenth Circuit employed a totality-of-the-circumstances approach before *Reeves*. *See, e.g.*, *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005) ("The list of factors [as to whether a seizure occurred] is non-exclusive and no one factor is dispositive." (citing *United States v. Abdenbi*, 361 F.3d 1282, 1291 (10th Cir. 2004))). *Reeves* itself considered the various circumstances implicating a seizure. *See* 524 F.3d at 1169 (discussing veracity of commands, duration of encounter, number of officers, and time of day). And since *Reeves*, the Tenth Circuit returned to the totality of the circumstances. *See, e.g.*, *United States v. Hernandez-Chaparro*, 357 F. App'x 165, 167 (10th Cir. 2009) ("*Given the totality of the circumstances*, we agree with the district court that the encounter was consensual." (emphasis added)).

At bottom, the Tenth Circuit's choice of approach does not matter for the present case. The APD seized Mr. Warford under either test.

2.      **Analysis**

The APD's encounter with Mr. Warford began with consent. The police knocked on the door and asked to talk to the driver of the black car. At this point, the officers had "do[ne] no more than any private citizen might do." *King*, 563 U.S. at 469. Although the occupants of the apartment opened the door, the occupants did not need to "allow the officers to enter the premises," and they could have "refuse[d] to answer any questions at any time." *Id.* at 470. In fact, the occupants did just that. When Officer Sallee asked, "Can we come in and talk to y'all?," the occupants declined.

Both parties agree, however, that the encounter became involuntary. Mr. Warford asserts that the police seized him inside the apartment and that "he opened the door as a result of coercive police conduct." ECF No. 25, at 6. The United States concedes as much, acknowledging that the location of the arrestee determines the location of the arrest. ECF No. 32, at 7. Because the encounter turned involuntary, at some moment, a reasonable person in Mr. Warford's position would not have felt "free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436.

When did this moment occur? The United States says that the police seized Mr. Warford when he opened the exterior door and stepped outside. ECF No. 32, at 7 n.5 ("Here, the defendant did not submit to officers' authority until he exited the apartment and was placed under arrest."). At the evidentiary hearing, Mr. Warford's counsel identified an earlier seizure: when the police attempted to turn the locked doorknob and ordered Mr. Warford to step outside. Tr. Hr'g 90. Neither is correct, although Mr. Warford is more accurate.[13]

_____

[13] The present facts—"[t]he scenario in which an individual voluntarily opens his door to the police and is subsequently seized while still inside his home"—distinguish this case from Tenth Circuit cases discussing seizures inside the home that police effect with actions outside the home. *Reeves*, 524 F.3d at 1166 n.4. The Court is not aware of a case from the Tenth Circuit or one of its district courts that examines a voluntary, across-the-threshold encounter that becomes involuntary.

Because police outside a home can arrest someone inside the home, the arrest must precede

the moment when the arrestee crosses the doorway and exits the home. *See Reeves*, 524 F.3d at

1167; *Maez*, 872 F.2d at 1450-51. Otherwise—that is, if an arrest occurs only when the arrestee

crosses the doorway—the arrest would not actually be inside the home. *See United States v.*

*Santana*, 427 U.S. 38, 40 n.1 (1976) (describing doorway as different from interior). To rewind

from when an arrestee crosses the doorway, perhaps the arrest occurs when the arrestee reaches

for the interior doorknob or when the arrestee steps toward the doorway. At least these moments

occur with the arrestee entirely within the home. More likely, however, these are consequences of

an earlier moment when a reasonable person no longer felt "free to decline the officers' requests

or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436. The categorical and totality-of-

the-circumstances approaches identify that earlier arrest.

        *a.*     *Seizure Under Categorical Approach*

The categorical approach asks whether officers, under color of authority, order an occupant

to exit the home. *Reeves*, 524 F.3d at 1167. If so, then the occupant's subsequent decision to open

---

    *Storey v. Taylor* involved similar facts, but it did not discuss the transition from a knock-and-talk to a seizure. *See* 696 F.3d 987, 992-94 (10th Cir. 2012). Nevertheless, *Storey* identified the moment of seizure as the officer's command: "[A] sufficiently coercive order requiring an individual to leave his own house counts as a seizure subject to the protections of the Fourth Amendment." *Id.* at 993. *Manzanares v. Higdon*, which is somewhat analogous, involved a consensual invitation for police to enter a home before the encounter turned involuntary. 575 F.3d 1135, 1140 (10th Cir. 2009). *Manzanares* identified the occupant's request for the officers to leave as triggering the seizure. *See id.* ("When [Occupant] Manzanares asked the officers to leave, the consensual encounter ended; Manzanares was 'seized,' and [Officer] Higdon's continued presence was permitted only if it comported with the Fourth Amendment.").

    Cases from other circuits apply a *Terry* analysis to an across-the-threshold seizure that begins as voluntary but becomes involuntary. *See, e.g.*, *United States v. Beaudoin*, 362 F.3d 60, 69 (1st Cir. 2004). But *Reeves*, despite disclaiming comment on this kind of case, emphasized that "[b]oth arrests and investigatory stops . . . are seizures under the Fourth Amendment" and "*Payton*'s requirements apply to all seizures." 524 F.3d at 1166; *accord Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1073 (10th Cir. 2010). Accordingly, the Court applies *Payton*'s presumption of unreasonableness to the warrantless seizure in this case.

the door is involuntary. *Id.* And if the decision is involuntary, then the police have seized the occupant inside the home. *See id.* at 1168; *see also Allen*, 813 F.3d at 85 ("[W]hen officers approach the door of a residence, announce their presence, and place the occupant under arrest when he or she, remaining inside the premises, opens the door in response to the police request, the arrest occurs inside the home, and therefore requires a warrant.").

As noted above, Mr. Warford's encounter with the APD began as a consensual knock-and-talk. Officer Sallee first tried to lure Mr. Warford outside by claiming that the police had hit the black car. But that did not work; Mr. Warford remained inside. Officer Sallee then spoke in the imperative: "Okay come outside." This was an order made under color of authority.

Then the conversation changed its tenor. After one more reference to scratching the car, the officers abandoned the ruse. Instead, Officer Lopez confirmed that Officer Sallee had seen Mr. Warford exit the black car. Officer Lopez then said that he would call auto theft. When Mr. Warford asked why, Officer Lopez said, "You're going to be under arrest, man. So we're going to be here until you come outside." This statement confirmed the status of Mr. Warford's liberty—a reasonable person in his position would no longer feel free to terminate the encounter. *Bostick*, 501 U.S. at 436; *see also Storey*, 696 F.3d at 993.

In sum, the APD seized Mr. Warford inside the home—probably when Officer Sallee spoke in the imperative, "Okay come outside," and certainly when Officer Lopez advised, "You're going to be under arrest, man. So we're going to be here until you come outside."

b.    *Seizure Under Totality-of-the-Circumstances Approach*

The totality-of-the-circumstances approach considers indicia of a seizure: for example, (1) the number of officers, (2) the display of uniforms, (3) the presence of weapons; (4) the veracity of the exit orders, (5) the duration of the encounter, and (6) the time of day. *See, e.g.*,

*Reeves*, 524 F.3d at 1168-69; *United States v. Flowers*, 336 F.3d 1222, 1226 n.2 (10th Cir. 2003);

*Maez*, 872 F.2d at 1446-47, 1450. This case involved (1) at least eight officers, (2) fully marked

tactical police vests and balaclavas, (3) holstered assault-style rifles, (4) level voices but orders

given in the imperative and warnings that Mr. Warford would be arrested, (5) a three-and-a-half-

minute exchange, (6) and broad daylight.

Two other cases—both resulting in seizures—are close fits. Applying the same numbering,

*United States v. Flowers* involved (1) four officers; (4) the single command, "Tulsa Police

Department, open the door"; (5) a brief exchange in which officers bought alcohol in a sting

operation and then ordered an occupant outside; and (6) a nighttime encounter. 336 F.3d at 1226

& n.2. And *Storey v. Taylor* involved (1) two officers; (4) a command, "Sir, step out of the house,"

that was followed by five similar commands; (5) an exchange that probably lasted around three

minutes;[14] and (6) a daytime encounter. *See* 696 F.3d at 991.

The eight (or more) officers here were significantly more than the four in *Flowers* and the

two in *Storey*. Those cases do not mention uniforms or weapons, but both were present here. The

APD's exit orders were like those *Flowers* and *Storey*. So too, this case's three-and-a-half-minute

exchange is of similar length. In fact, the only factor in which this case's encounter is less coercive

than *Flowers* is the time of day—and this encounter is not less coercive than *Storey* on that fact.

It is true that the Tenth Circuit highlighted the time of day in a previous case. *See Reeves*,

524 F.3d at 1169 & n.7 (finding a seizure where, among other circumstances, the "encounter began

between 2:30 and 3:00 in the morning, a time which must be taken into consideration when

analyzing the coerciveness of the encounter"; citing a case that "placed significant emphasis on

---

[14] *Storey* provides a transcript of the exchange rather than specifying its duration. *See* 696 F.3d at 990-91.

the late hour of an encounter" (citing *United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997))). But a reasonable person's confidence to terminate an encounter with law enforcement probably does not turn on the level of sunshine—at least when faced with eight uniformed officers, assault-style rifles, and commands to leave one's home. Indeed, the Tenth Circuit recognized a daytime seizure in *Storey*. *See* 696 F.3d at 991 (noting that officers arrived when occupant's wife had "gone to pick up the couple's children from school").

In the end, this case's greater number of officers and certainty about the display of uniforms and weapons show more coercion than those facts from *Flowers* and *Storey*; that offsets any loss in coercion due to this case's occurrence in daylight. If the circumstances in *Flowers* and *Storey* set the bar for a seizure, then the circumstances here clear it.

Finally, the level of coercion here probably matched *Flowers* and *Storey* when Officer Sallee spoke in the imperative, "Okay come outside," and certainly when Officer Lopez advised, "You're going to be under arrest, man. So we're going to be here until you come outside." Given the totality of the circumstances, a reasonable person receiving those commands would no longer feel free to terminate the encounter. *Bostick*, 501 U.S. at 436; *see also Storey*, 696 F.3d at 993.

### 3.   Conclusion to Seizure Analysis

Under the two tests for showing an across-the-threshold seizure, the APD officers seized Mr. Warford. They probably did so when Officer Sallee commanded Mr. Warford's exit and certainly did so when Officer Lopez informed of Mr. Warford of his impending arrest. This warrantless seizure is presumptively unreasonable. *See Payton*, 445 U.S. at 586.

### C.   Exceptions to the Warrant Requirement

Because the warrantless seizure is presumptively unreasonable, the United States carries the burden of rebutting this presumption. *See Kendall*, 14 F.4th at 1122. The United States can do

so by showing the existence of probable cause and exigent circumstances. *Reeves*, 524 F.3d at 1169 (citing *Payton*, 445 U.S. at 590) ("Officers may enter an individual's home without consent and conduct a warrantless arrest if both probable cause and exigent circumstances exist."). The APD had probable cause to arrest Mr. Warford once the NCIC informed the police officers that the black car was reported as stolen. *See Miller v. City of Nichols Hills Police Dep't*, 42 F. App'x 212, 216 (10th Cir. 2002); *see also Dorato v. Smith*, 108 F. Supp. 3d 1064, 1143 (D.N.M. 2015). Thus, the United States must prove that exigent circumstances existed.

Exigencies include an occupant's need for emergency assistance, threats to an officer's own safety, the "imminent destruction of evidence," and the risk of a suspect's escape. *Lange*, 141 S. Ct. at 2017 (quoting *Brigham City*, 547 U.S. at 403). A court evaluates "the circumstances as they would have appeared to prudent, cautious, and trained officers." *Reeves*, 524 F.3d at 1169 (citing *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998)).

Here, the United States contends that the APD faced several exigencies. *See* ECF No. 32, at 10. First, claims the United States, Mr. Warford threatened the officers' safety because he might have been arming himself. In the United States' view, Mr. Warford "could resist arrest or escape by using violence against officers." *Id.* Second, the United States highlighted that Mr. Warford could threaten other occupants. The APD (says the United States) might have worried about a "possible barricaded subject with hostages." *Id.* The United States alternatively adds that Mr. Warford might have been collaborating with other occupants to attack officers. *Id.* Finally, to support the allegations of these threats, the United States asserts that "[o]fficers knew that the defendant was a convicted felon who was observed exiting a vehicle that was reported as stolen." *Id.*

The progression of the APD's encounter with Mr. Warford undermines these arguments. When the officers began the knock-and-talk, the United States' speculated threats were evidently

absent from the officers' minds. Consider a prudent and cautious officer who worried about a suspect arming himself, taking hostages, or plotting an attack. That officer probably would not knock on the door and attempt to induce the suspect outside by claiming that his fellow officers "accidentally hit" an occupant's car. To be sure, the officers' behavior was appropriate when the knock-and-talk began. That behavior, though, demonstrated a lack of exigency.

Nor did exigency arise during the voluntary part of the encounter. The officers could see Mr. Warford through the security door. He was not arming himself, barricading hostages, or conspiring with the other occupants. Thus, when the encounter lost its consensual nature, no exigency existed.

Note, too, that the officers allowed Mr. Warford to briefly shut the interior solid door and fetch his jacket. A prudent and cautious officer who worried about violence from a suspect would not have let Mr. Warford disappear, even for only twenty seconds. This further shows a lack of exigency.

Finally, the United States does not offer evidence to prove its contention that the officers knew Mr. Warford was previously convicted of a felony. *See Reeves*, 524 F.3d at 1169 (noting that suspect's flight plans could not support exigency when government did not provide evidence of officers' contemporaneous knowledge of these plans). In fact, there is no evidence that the officers knew Mr. Warford's identity at the beginning of their encounter—much less his criminal history. The officers' knowledge that Mr. Warford exited a stolen vehicle is not enough to show exigency. *See, e.g.*, *United States v. Stanek*, 536 F. Supp. 3d 725, 742 (D. Haw. 2021).

The United States does not meet its burden to show that exigent circumstances were present. As a result, the United States has not overcome *Payton*'s presumption that the warrantless arrest was unreasonable. The APD officers thus violated Mr. Warford's Fourth Amendment rights.

### D.      Exclusionary Rule

A judicially created rule "excludes evidence obtained in violation of the Fourth Amendment from being used at trial." *United States v. McCane*, 573 F.3d 1037, 1042 (10th Cir. 2009) (citing *Herring v. United States*, 555 U.S. 135, 140-41 (2009)). This exclusionary rule may suppress evidence that is "fruit of the poisonous tree"—in other words, evidence discovered as a direct result of unlawful activity. *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006). But the exclusionary rule "applies only where it results in appreciable deterrence." *McCane*, 573 F.3d at 1042 (quoting *Herring*, 555 U.S. at 700).

Overtime, courts have recognized that exclusion will yield insufficient deterrence when police act in good faith or would have inevitably discovered the evidence at issue. *See, e.g.*, *United States v. Leon*, 468 U.S. 897, 906 (1984) (recognizing good-faith exception to exclusionary rule); *Nix v. Williams*, 467 U.S. 431, 444 (1984) (recognizing inevitable-discovery exception to exclusionary rule). The United States contends that both good-faith police action and inevitable discovery are present. If either is present, then exclusion will yield insufficient deterrence, and the Court will admit the physical evidence and statements that directly followed from the warrantless arrest. But if not, the Court will exclude the physical evidence and statements.

### 1.      Good Faith

"The exclusionary rule 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.'" *McCane*, 573 F.3d at 1042 (quoting *Leon*, 468 U.S. at 919). As a result, a court will not exclude evidence that officers obtained unlawfully but while acting in good faith. *See Davis v. United States*, 564 U.S. 229, 238 (2011). The government has the burden to show that the good-faith exception applies. *United States v. Corral-Corral*, 899 F.2d 927, 932 (10th Cir. 1990).

As case law developed, applications of the good-faith exception all "involved instances in which the police 'acted in objectively reasonable reliance on some seemingly immutable authority,' i.e. 'a neutral third-party's authorization.'" 3 Wayne LaFave, *Search & Seizure* § 1.3(g), at text accompanying nn. 84-87, Westlaw (database updated Oct. 2022) (quoting *United States v. Katzin*, 769 F.3d 163, 189-90 (3d Cir. 2014) (en banc) (Greenaway, J., dissenting)); *see, e.g.*, *Leon*, 468 U.S. at 916 (reliance on warrant—that is, a magistrate judge's error); *Illinois v. Krull*, 480 U.S. 340, 348, 350-53 (1987) (reliance on invalidated statute—that is, a legislature's error); *Arizona v. Evans*, 514 U.S. 1, 14-16 (1995) (reliance on judicial employee's error); *Herring*, 555 U.S. at 147-48 (reliance on error by clerk from a different police department than the arresting police officers). More recently, *Davis v. United States* extended the pattern. *See* 564 U.S. at 232. The case applied the good-faith exception to a police officer's reliance on binding judicial precedent that was ultimately overruled—that is, an appellate court's error. *Id.*

But *Davis* also indicates that the exclusionary rule applies in cases beyond a police officer's reliance on a third party's error. *Id.* at 238 ("[W]hen the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" (first quoting *Leon*, 468 U.S. at 909; then quoting *Herring*, 555 U.S. at 137; and then quoting *Leon*, 468 U.S. at 919, 908 n.6)). In particular, *Davis* used the language "isolated negligence" rather than "isolated negligence in reliance on a third party." *Id.*

Since *Davis*, the Tenth Circuit has sometimes policed the boundaries of the good-faith exception. In *United States v. Loera*, a panel wrote that "[t]he good faith exception does not apply in a case like the one before us because the illegality at issue stems from unlawful *police* conduct, rather than magistrate error, and therefore the deterrence purposes of the Fourth Amendment are

best served by applying the exclusionary rule." 923 F.3d 907, 925 (10th Cir. 2019). *Loera*, therefore, supports the thesis that reliance on a third party's error remains necessary for the good-faith exception in the Tenth Circuit. At the same time, *Loera* cannot limit the good-faith exception to a police officer's reliance on a magistrate's error. Such a reading would flout a case like *Herring v. United States*, in which a police officer relies on the error of a police employee from a different county. *See* 555 U.S. at 147-48

Loera did not discuss *Davis*'s statement that isolated negligence yields insufficient deterrence. But an earlier Tenth Circuit did so. *United States v. Madden* highlighted that, "[i]n *Davis*, the Court stated that 'the harsh sanction of exclusion' does not apply to objectively reasonable law enforcement activity because '[e]xcluding evidence in such cases deters no police misconduct and imposes substantial social costs.'" 682 F.3d 920, 929 (2012) (alteration in original) (quoting *Davis*, 564 U.S. at 249). True, *Madden*—like *Davis*—involved reliance on binding judicial precedent. Still, the broad language suggests a general good-faith exception that extends beyond police reliance on a third party's mistake. *See also United States v. Nicholson*, 721 F.3d 1236, 1257 (10th Cir. 2013) (Gorsuch, J., dissenting) (recognizing *Davis* created a "new culpability framework").

The reach of the good-faith exception will not affect this case. The Court rejects application of the exception no matter if the exception applies only when police rely on a third party's mistake or if the exception sweeps more broadly. The APD officers did not rely on a third party's mistake— for example, a bad warrant, statute, judicial decision, or clerical error—when they arrested Mr. Warford. Nor can the APD officers claim an "objectively reasonable good-faith belief that their conduct was lawful." *Davis*, 564 U.S. at 238.

As described above, the APD officers' conduct is analogous enough to the officer conduct in *Storey v. Taylor*. *See* discussion *supra* Section IV.B.2. And *Storey* denied qualified immunity. *See* 696 F.3d 987, 996 (10th Cir. 2012). This means that the *Storey* officer violated clearly established law. *Id.* at 997. In other words, the Fourth Amendment right in *Storey* was "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). By analogy, therefore, the APD officers here cannot claim an "objectively reasonable good-faith belief that their conduct was lawful." *Davis*, 564 U.S. at 238. In sum, regardless of the exact perimeters of the good-faith exception in the Tenth Circuit, the exception does not apply.

### 2.    Inevitable Discovery

"When evidence is obtained in violation of the Fourth Amendment, that evidence need not be suppressed if agents inevitably would have discovered it through lawful means independent from the unconstitutional search." *Loera*, 923 F.3d at 928 (citing *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014)). The government has the burden to prove, by a preponderance of the evidence, that police officers would have otherwise and lawfully obtained the evidence. *Id.*

The "ultimate question" is "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant." *Christy*, 739 F.3d at 541, 543 (quoting *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000)). Four factors help show inevitable discovery:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Id.* at 541 (quoting *Souza*, 223 F.3d at 1204).

Here, the first and third factors cut for Mr. Warford. The United States offers no evidence that the APD had completed any part of the warrant process. Nor does the United States assert that a warrant was ultimately obtained. But the second and fourth prongs cut for the United States. The APD had probable cause to arrest Mr. Warford. *See supra* Section IV.C. And the Court believes that the APD's exchange with Mr. Warford was a knock-and-talk that went awry rather than a conscious attempt by officers to avoid seeking a warrant because they lacked probable cause.

Although the United States does not balance these factors, the United States does address the first part of the "ultimate question"—that is, the likeliness of a warrant's issuance. The United States claims that "the officers would have easily obtained a search warrant if the defendant had refused to exit the apartment." ECF No. 32, at 13.

The Court agrees. If the officers had left the balcony once the exchange turned involuntary, then they would have sought a warrant. After all, the APD officers watched Mr. Warford exit a stolen vehicle. *See, e.g.*, *United States v. Coleman*, 554 F. Supp. 3d 1124, 1155 (D.N.M. 2021) (finding persuasive Seventh Circuit reasoning that "[t]he government is not required to show that investigators *in fact* obtained or sought a warrant in order to prove that they *inevitably would have done so*" (citing *United States v. Pelletier*, 700 F.3d 1109, 1112-13 (7th Cir. 2012))).

In support of the United States, two recent district court cases applied the inevitable discovery exception to evidence obtained in warrantless arrests in homes that police effected with coercive action outside homes. *See United States v. Martinez*, No. 19-cr-40108, 2020 WL 5747922, at *13-14 (D. Kan. Sept. 25, 2020) (finding, as here, that only factors (2) and (4) favored government); *United States v. Kinney*, No. 18-cr-01828, 2019 WL 5213022, at *3, *6, *7 (D.N.M. Oct. 16, 2019) (finding, unlike here, that all four factors favored government). These cases thus

implicitly held that "a warrant would have been issued and that the evidence would have been found pursuant to the warrant." *Christy*, 739 F.3d at 541 (quoting *Souza*, 223 F.3d at 1204).

Consider, however, the evidence that Mr. Warford seeks to suppress: his statements, the key fob on the lanyard around his neck, and cards found in his pockets. The Court does not believe—by a preponderance of the evidence—that *this* evidence would have been inevitably discovered. The officers in *Kinney* and *Martinez* searched the occupants' homes after the arrests. *See Martinez*, 2020 WL 5747922, at *7; *Kinney*, 2019 WL 5213022, at *3. The disputed evidence here, by contrast, came off Mr. Warford's person and out of his mouth.

Assume that the APD officers waited in the parking lot to get a warrant. The United States has not proven by a preponderance of the evidence that if the officers later arrested Mr. Warford with a warrant, then Mr. Warford would have made the same statements, the key fob would have remained around his neck, and the same items would have been in his pockets. Thus, although the Court accepts that the APD officers could (and probably would) have gotten a warrant, the Court doubts that the same "evidence would have been found pursuant to the warrant." *Christy*, 739 F.3d at 541 (quoting *Souza*, 223 F.3d at 1204). As a result, the inevitable discovery exception to the exclusionary rule does not apply.

### 3.   Conclusion to Exclusionary Rule Analysis

No exception indicating insufficient deterrence overcomes the exclusionary rule's application to this case. The Court will thus suppress evidence that is "fruit of the poisonous tree"—in other words, physical evidence and statements discovered as a direct result of the APD's unlawful activity. *See Olivares-Rangel*, 458 F.3d at 1108-09.

E.        *Miranda v. Arizona*

As an alternative to the Court's holding that Mr. Warford's post-arrest statements are fruits of the poisonous tree, the Court holds that Mr. Warford's statements made after the arrest are poisonous trees themselves. The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. Under *Miranda v. Arizona*, "the government may not use any statements stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). A court (1) examines all the circumstances of a potential interrogation to determine whether the suspect was in custody and (2) considers whether a reasonable person in that situation would have felt that he or she could terminate the interrogation. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). For *Miranda* purposes, an interrogation includes express questioning as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

To summarize the earlier analysis, a reasonable person in Mr. Warford's position would not have felt free to leave during the encounter with the APD—probably when Officer Sallee spoke in the imperative, "Okay come outside," and certainly when Officer Lopez advised, "You're going to be under arrest, man. So we're going to be here until you come outside." *See* discussion *supra* Section IV.B.2. As a result, Mr. Warford was in custody. *See Keohane*, 516 U.S. at 112.

Soon after Mr. Warford was in custody, he was under interrogation. Officer Lopez asked, "Do you know who the owner of the vehicle is?" Officer Lopez then followed with the statement, "Alright so the last thing we want to do is get a warrant and search your whole apartment, dude.

61

But if you know who the owner is, give me a phone number, I'll call, and I can verify." Officer Lopez thus directly questioned Mr. Warford and issued imperatives that were reasonably likely to elicit a response. Mr. Warford was under interrogation. *See Innis*, 446 U.S. at 300-01.

Because Mr. Warford was unwarned and under custodial interrogation, the Court will suppress any statements that Mr. Warford made under these circumstances.

### F.    Conclusion to Analysis of Physical Evidence and Statements

Mr. Warford successfully invoked *Payton*'s presumption: the warrantless arrest in the apartment was unreasonable. The APD officers arrested Mr. Warford—probably when Officer Sallee commanded Mr. Warford's exit and certainly when Officer Lopez advised Mr. Warford that he would be under arrest—even though they stood outside the apartment. No exigencies overcome the *Payton*'s presumption. Because the good-faith and inevitable-discovery exceptions do not apply, the Court will suppress the key fob, the items and cards found in Mr. Warford's pockets, and statements made during the encounter. And, in the alternative, *Miranda* bars admission of unwarned statements taken during custodial interrogation.

## V.    Conclusion

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that

1. Motion to Dismiss Indictment with Prejudice for Violations of Sixth Amendment Speedy Trial Right and the Speedy Trial Act (**ECF No. 23**) is **DENIED**;

2.  Defendant's Opposed Motion to Suppress Identification of Defendant (**ECF No. 24**) is **GRANTED**; and

3. Defendant's Opposed Motion to Suppress Physical Evidence and Statements (**ECF No. 25**) is **GRANTED**.

HONORABLE JUDITH C. HERRERA
Senior United States District Judge